## MICHAEL P. De BLEECKER v. MONTGOMERY COUNTY, MARYLAND et al.

[No. 51, September Term, 1981.]

*Decided January 8, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*D. Leah Meltzer,* with whom was *Gary Howard Simpson* on the brief, for appellant.

*Amicus curiae* brief of The Maryland Lawyers Council filed. *Christopher Brown* and *Michael Millemann* on the brief.

*Amicus curiae* brief of State of Maryland filed. *Stephen H. Sachs, Attorney General,* and *Diana G. Motz, Assistant Attorney General,* and *Robert A. Zarnoch, Assistant Attorney General,* on the brief.

*Hugh E. Donovan,* with whom were *Donovan & Nash* on the brief, for appellees Montgomery County, Blake and Sander and by *Craig S. Rice,* with whom were *McInerney, Layne & Rice* on the brief, for appellees Montgomery County Board of Education and Norma C. Day.

MURPHY, C. J., delivered the opinion of the Court.

The principal issue in this case is whether the trial court, in granting directed verdict motions against Rev. Michael P. De Bleecker, properly concluded as a matter of law that he had not been discharged from his public employment as a teacher in Montgomery County in violation of his constitutionally protected right of free speech under the first amendment to the United States Constitution.

## I

De Bleecker filed a four-count declaration in the Circuit Court for Montgomery County, alleging a conspiracy to deprive and a deprivation of his civil rights under 42 U.S.C. §§ 1983 and 1985.[1] Joined as defendants were Montgomery

---

1. 42 U.S.C. § 1983 provides:

   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

County, Maryland (the County), the County Board of Education (the Board), Gary Blake, Director of the Montgomery County Detention Center (the Center), Norma Day, Director of Adult Education of the County public school system, and Larry Sander, Director of the County Board of Corrections. The declaration alleged that De Bleecker, an ordained Roman Catholic diocesan priest, was a nontenured temporary teacher employed by the Board for the sole purpose of teaching inmates at the Detention Center; that on July 22, 1977, there was an altercation between inmates at the Center, which was quelled by the use of unnecessary force by a Center guard; that De Bleecker made statements to the inmates and filed a written report with Center authorities, indicating his disagreement with the violent action taken by the guard; and that as a result of his verbal statements and written report, he was discharged from his teaching position at the Center. De Bleecker alleged in the declaration that in terminating his public employment each of the defendants had violated his constitutional right to free speech, that the natural defendants had conspired among themselves to deprive him of his civil rights, and that he was denied his right to an administrative hearing to determine the reason for his discharge. De Bleecker sought compensatory and punitive damages. The defendants filed general issue pleas, together with pleas of justification.

---

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1985 provides in pertinent part:

"If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . .; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

At the trial, De Bleecker testified on his own behalf; he also introduced the depositions of Blake, Day and Sander as part of his case. The evidence so adduced by De Bleecker showed that on July 22, 1977, there was a fight between inmates at the Center, following which De Bleecker and several guards, none of whom had witnessed the fight, found Antonio Thomas lying on the floor in another inmate's cell. De Bleecker testified that he helped Thomas to his feet and was walking with him towards the dormitory when a correctional officer, Sergeant Barricklow, grabbed Thomas and accused him of fighting. According to De Bleecker's testimony, Barricklow, assisted by two other guards, forced Thomas into another cell; that while he (De Bleecker) could not see into the cell, he heard sounds of a struggle; that the guards refused to permit him to enter the cell; and that when Thomas later emerged from the cell, his head was swollen and bloody. De Bleecker said that thereafter he returned to the classroom where some inmates were discussing the incident. De Bleecker admitted expressing to the inmates his disapproval of Sergeant Barricklow's violent conduct and he acknowledged advising them to tell the truth about the incident and not to be afraid. He also told Blake, according to Blake's deposition that he had discussed with the inmates "that the officers were violent and brutal, and something should be done."

De Bleecker submitted a written report to Center officials later that day in which he recounted his observations of the incident and set forth his disapproval of Barricklow's actions. In his report, De Bleecker stated that "as an educator I have to disagree with this violent procedure, since everything seemed to be under control and violence only generates violence." De Bleecker's written report stated that Thomas had "fought back which seems to be psychologically understandable because the man hadn't done anything wrong." The report concluded:

"[T]hey had tied Thomas down on his bed but he seemed to be semi-unconscious. Sgt. Barricklow seemed all of a sudden scared and asked Thomas if

he would get him some pills. Then he brought him out to bring him to the nurse and asked me if I had seen anything. I understood that he wanted to ask me if I had seen him hurting Thomas badly. I said 'no' because I did not see him doing it, but I reiterate my statement, that they grabbed the wrong one and that Thomas had been unnecessarily irritated."

De Bleecker testified that three days after he filed his written report, Blake, the Director of the Center, informed him that he was investigating the incident and that De Bleecker was to take the day off because the guards would not permit him inside the Center. Shortly thereafter, Blake wrote to the Board, stating that De Bleecker had acted in an irresponsible and emotional manner and that his report "consists of supposition and false accusations which cannot be substantiated." In his letter, Blake stated that his investigation revealed that Sergeant Barricklow had acted properly; that De Bleecker's discussion with the inmates of the sergeant's violence was a "serious security violation which could result in further incidents and could jeopardize the effectiveness of Sgt. Barricklow"; and that

"[i]nmates are quick to spread gossip and some will attempt to place the security and administration of the Detention Center in a compromising position by spreading rumors. Mr. De Bleecker was considered a staff member therefore, what he says has validity in the inmate population."

Blake advised the Board that De Bleecker's services were no longer desired or permitted at the Center. He said in his letter that De Bleecker's report accusing Sergeant Barricklow of violence had been "proven incorrect" and had created "an irreconcilable gap between himself and the correctional staff." The continuance of De Bleecker's employment, Blake said in his letter, would jeopardize the educational program at the Center.

The evidence revealed that Blake had discussed his findings with both Day and Sander, each of whom agreed

with Blake's decision to terminate De Bleecker's employment. De Bleecker was later advised by letter signed by Day that the Board had reviewed the information provided by the Center and as a result found it necessary to terminate his employment as a teacher at the institution.

At the close of De Bleecker's evidence, the trial judge granted the directed verdict motions of all the defendants on all counts. He ruled that "as a pure matter of contract law and employer/employee law [De Bleecker] was not entitled to a pre-termination hearing." He observed that "[t]here was no contention made that he was under a specific term of employment," it being conceded that De Bleecker was a temporary, at-will employee. The court also found that because of the difficulty in maintaining order and the need for a high level of discipline in a penal facility, De Bleecker's verbal remarks to the inmates concerning the guard's actions were not constitutionally protected. The trial judge said that De Bleecker's "subsequent discharge grounded upon that conduct is not a violation of any constitutional right." He explained:

> "What [De Bleecker] put into that report to Gary Blake was, in my judgment from the evidence thus far, fully protected.
>
> ". . . It is my judgment at this stage of the case that if the evidence indicated the decision was made to bar him from access to the Detention Center solely upon that report, the case would probably have to proceed forward. But the evidence is just as strong that that was not the sole reason for his being barred from the Detention Center. . . .

* * *

> "If one considers that Blake and Sander took into consideration the written report as well as the oral conduct in making their decision to terminate or bar his entrance, which would have had the effect to terminate, then perhaps one, under the cases, has to look at the protected conduct and determine

whether that was considered by the employer as well. If in fact it was, the protected conduct that was a significant reason for the dismissal, then again perhaps the case would have to go on and be a question for the jury.

"But again, as a matter of law, it is clear from the evidence that he would have been discharged for his unprotected conduct [comments to the inmates] even in the absence of the report."

De Bleecker appealed to the Court of Special Appeals, which affirmed the judgment. *De Bleecker v. Montgomery County,* 48 Md. App. 455, 427 A.2d 1075 (1981). That court held that a temporary at-will employee who is terminated according to the terms of his contract does not have a constitutionally protected interest in the continuation of his employment. It further concluded that "De Bleecker was not entitled to a pre-termination hearing, and the Board's action in terminating De Bleecker's employment did not violate any of his constitutional rights." 48 Md. App. at 464-65. In a footnote to that comment, the court noted: "Even if his speech were protected, his job was not." *Id.* at 465 fn. 5.

The intermediate appellate court relied on *Parker v. Board of Education of Prince George's County, Md.,* 237 F. Supp. 222 (D.C. Md.), *aff'd,* 348 F.2d 464 (4th Cir. 1965), *cert. denied,* 382 U.S. 1030, 86 S. Ct. 653, 15 L. Ed. 2d 543 (1966). That case involved a probationary public school teacher who sued the County Board of Education, alleging a denial of due process when his position was terminated without a hearing. Parker claimed that he was discharged in violation of the first amendment for using Aldous Huxley's *Brave New World* in his classroom instruction. The trial court granted the defendant's motion for summary judgment, stating:

"Even if such allegations [denial of plaintiff's freedom of speech] were present, they would afford no ground for the relief sought in this case. The right of free speech or expression, like other First Amendment guarantees, is not absolute. Where the abridgement of the abstract right of free speech

> results from government action taken for the pro-
> tection of other substantial public rights, no con-
> stitutional deprivation will be found to exist . . . .
> No unconstitutionality results where the right of
> free speech is reasonably curtailed as a prerequisite
> to continued government employment. . . ." *Id.* at
> 229 (citations omitted).

The Fourth Circuit, in affirming the District Court, did not reach Parker's constitutional claim but relied solely on the terms of his provisional employment contract.

We granted certiorari to consider De Bleecker's argument that as a public employee he could not, on the record in this case, be terminated for exercising his free speech rights, especially absent a due process hearing regarding the reason for his discharge.

## II

The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, *i.e.,* at will, can be legally terminated at the pleasure of either party at any time. *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981). The rule is inapplicable, however, if the decision to terminate the public employment was made because of the employee's exercise of constitutionally pro-tected first amendment rights. *Perry v. Sinderman,* 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972); *DiGrazia v. County Exec. for Mont. Co.,* 288 Md. 437, 418 A.2d 1191 (1980). Thus, while it was within the power of the defendants to remove De Bleecker from his position, their decision to discharge him "would not have been lawful if it was made because of [De Bleecker's] exercise of constitutionally pro-tected first amendment rights." *DiGrazia,* 288 Md. at 447, citing *Perry.* The threshold issue is whether De Bleecker's verbal or written statements, or both, were constitutionally protected.

*DiGrazia* dealt with the interpretation of a Maryland stat-ute known as the Law Enforcement Officer's Bill of Rights

and a section thereof which prohibited the discharge of a police officer for exercising his right of free speech. DiGrazia, an at-will official of a county police department, was discharged for allegedly making public derogatory statements about the department's performance. He claimed that his constitutional right of free speech had been transgressed as a result of his termination. We reversed a summary judgment entered against DiGrazia, stating:

> "Whether DiGrazia was removed from his position as a punitive measure for exercising his right of free speech — a right expressly protected by § 733 — is a mixed question of law and fact, not appropriate for resolution on summary judgment. Indeed, DiGrazia does not even admit making the statements attributed to him, and Gilchrist [the employing authority] concedes that had DiGrazia not made the statements he might not have removed him." *Id.* at 452.

In deciding *DiGrazia,* we relied on guidelines established by the Supreme Court in *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977), and in *Pickering v. Board of Education,* 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). These same guidelines are applicable to the present case.[2]

In *Pickering,* the Supreme Court established a balancing test for determining when a public employee's speech is protected by the first amendment. In that case, a public school teacher was dismissed for a letter he had written to a newspaper criticizing the local Board of Education. To resolve the constitutional claim, the Court weighed the interest of the teacher, as a citizen, in commenting on matters of public concern, against the State's interest, as an employer, in providing efficient public service. Although the Court rejected the argument that public employers may

---

**2.** While we recognize that Parker v. Board of Education of Prince George's County, Md., *supra,* has not been expressly overruled, the great weight of authority is aligned against its holding. *See Perry, supra.*

condition employment on relinquishment of first amendment rights, it noted that

> "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568.

The determination of whether the employee's speech was constitutionally protected depended, the Court said, on both the nature of the speech and the nature of the employment relationship. In considering the former, the Court viewed such factors as whether the speech related to a matter of public concern, and whether it was accurate or false and defamatory. In considering the latter element, the Court said that an appraisal is necessary with respect to the impact of the speech on the employment relationship and on the efficiency of the public service. The relevant factors to examine include whether the speech was directed at someone with whom the speaker had a close working relationship for which it could persuasively be claimed that personal loyalty and confidence are necessary to its proper functioning, and whether the speech migh disrupt discipline or harmony among co-workers. The Court decided in *Pickering* that the interests of the school board in limiting the teacher's speech were not significantly greater than the interest in suppressing a similar communication by a member of the general public. It concluded that because the Board did not prove knowing falsity or reckless disregard for the truth within the meaning of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), Pickering's dismissal was a violation of his right to freedom of speech. Although under the facts of the case, the teacher's first amendment rights were considered no different than those of the general public, *id.* at 573, *Pickering* permits imposing different standards where the statement directly affects the ability of an employee to carry out his duties. *Id.* at 569.

In *Mt. Healthy City Board of Ed. v. Doyle, supra,* the Supreme Court set out the test for determining whether a

public employee had been properly discharged from his position notwithstanding the fact that his speech was constitutionally protected. There, a school teacher was not rehired, at least in substantial part, because he had informed a radio station that the school board had circulated a dress code for adoption by teachers. Under the test formulated by the Court, the employee has the burden to show that the protected conduct was a substantial or motivating factor in his removal. If this burden is discharged, then the burden shifts to the employer to prove by a preponderance of the evidence that it would not have continued the employment even absent the protected speech. The issue is to be resolved in favor of the employee only if the trier of fact finds that he would have been reemployed but for the protected conduct. The Court observed:

> "The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision." 429 U.S. at 285-86.

### III

Assuming without deciding that the trial judge was correct in concluding under the *Pickering* balancing test that De Bleecker's oral statements to the inmates, even if true, were not constitutionally protected speech but that his written report made in the chain of command was protected,

we think he nevertheless erred in holding as a matter of law that De Bleecker "would have been discharged for his unprotected conduct even in the absence of the report." Under *Mt. Healthy,* De Bleecker had the burden of adducing evidence to establish that his constitutionally protected written report was a substantial or motivating factor in the decision to terminate his employment. There was evidence showing that Blake's letter to the Board twice mentioned the report as a justification for his determination that De Bleecker's services "are no longer desired or permitted at the Detention Center." This evidence is in conflict with testimony in Blake's deposition wherein he, in effect, denied using the report as a basis for barring De Bleecker from the Center. The trial judge acknowledged that if the decision to terminate was based solely on the written report, a directed verdict would be improper, but he said the evidence "is just as strong that that was not the sole reason for his being barred from the Detention Center." However, in view of the evidentiary conflict, it is plain that the trial judge could not properly resolve issues of fact on a directed verdict motion; consequently, he could not, as a matter of law, conclude that De Bleecker would have been fired solely for his oral comments to the inmates absent consideration of the protected conduct. The directed verdict standard applied in Maryland requires that we consider the evidence in a light most favorable to the nonmoving party and interpret every reasonable inference in its favor. *Impala Platinum v. Impala Sales,* 283 Md. 296, 389 A.2d 887 (1978). Indeed, "[i]f there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict." *Id.* at 328. We think the question was one for the jury in the circumstances of this case.

On retrial, the question whether De Bleecker's oral comments were constitutionally protected will again arise. Manifestly, that determination must be made in view of the competing considerations involved between the interests of citizens in commenting upon matters of public concern and

the legitimate governmental interest in order and security essential in the management of a penal facility. *See Procunier v. Martinez,* 416 U.S. 396, 413-14, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974). It is, of course, appropriate that the *Pickering* balancing test be struck in the context of the special factual tableau of a prison facility. *See Choudhry v. Jenkins,* 559 F.2d 1085, 1089 (7th Cir. 1977), *cert. denied,* 434 U.S. 997. The ultimate determination of whether speech is constitutionally protected under *Pickering* is a question of law for the court, although in striking the balance there may be factual matters appropriate for determination by a jury. *See Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979); *Williams v. Board of Regents of University System,* 629 F.2d 993, 1003 (5th Cir. 1980); *Schneider v. City of Atlanta,* 628 F.2d 915 (5th Cir. 1980), and particularly n. 4 at 919.

Liability, if any, of the County, the Board and the natural defendants in actions arising under 42 U.S.C. §§ 1983 and 1985 is governed by the following principles. Municipalities and other local governmental units are considered "persons" within the contemplation of § 1983, *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), and may be sued under the statute for

> "monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental

'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels. As Mr. Justice Harlan, writing for the Court, said in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-168 (1970): 'Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Id.* at 690-91.[3]

Blake, Day and Sander are also potentially subject to § 1983 liability, *Procunier v. Navarette,* 434 U.S. 555, 98 S. Ct. 855, 55 L. Ed. 2d 24 (1978), but may assert good faith as a complete defense to the action. This qualified immunity will not be available to them if

"the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm."

*Procunier* at 562. *See also Wood v. Strickland,* 420 U.S. 308, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975).

Their immunity will also be stripped if they are shown to have acted with " 'malicious intent[ ]' to deprive [De Bleecker] of a constitutional right or to cause him 'other injury.' " *Procunier* at 566. The County and its agencies may not, however, assert the good faith of its officials as a

---

**3.** However, a municipality may not be sued for punitive damages. Newport v. Facts Concerts, Inc., 453 U.S. 247, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981).

defense. *Owen v. City of Independence,* 445 U.S. 622, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980).[4]

> *Judgment reversed; case remanded for a new trial; costs to be paid by the appellees.*

---

**4.** Unlike municipalities, the State and its agencies are immune from suit under § 1983, unless the immunity is waived. Quern v. Jordan, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979); Highfield Water Co. v. Public Service Com'n, 488 F. Supp. 1176 (D. Md. 1980).

Since De Bleecker sued only for monetary damages, we need not decide whether he was entitled under Board of Regents v. Roth, 408 U.S. 564, 573, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972), and Codd v. Velger, 429 U.S. 624, 97 S. Ct. 882, 51 L. Ed. 2d 92 (1977), to an opportunity to refute the charges against him and thus "clear his name" at an administrative hearing. De Bleecker does not deny that he made the oral remarks to the inmates and for that reason an administrative hearing, in the present posture of this case, would indeed be futile. *See* K. Davis, *2 Administrative Law,* § 11.6 at 368 (1979).