475 A.2d 494

MARYLAND NATIONAL CAPITAL PARK & PLANNING COMMISSION, et al.

v.

Elsie CRAWFORD.

No. 894, Sept. Term, 1983.

Court of Special Appeals of Maryland.

June 6, 1984.

278

D.S. Sastri and Arthur S. Drea, Jr., Silver Spring, with whom were Sanford E. Wool and Thurman H. Rhodes, Silver Spring, on the brief, for appellants.

Stephen H. Sachs, Atty. Gen., Diana G. Motz and Robert A. Zarnoch, Asst. Attys. Gen., for amicus curiae, State of Md.

Karl G. Feissner, Hyattsville, with whom were John E. Beckman, Jr., Laurie D. Lewis and Feissner & Beckman, Hyattsville, on the brief, for appellee.

Argued before MOYLAN, WEANT and ALPERT, JJ.

ALPERT, Judge.

The principal issue presented in this case is whether an employer engages in unlawful employment practices [1] proscribed by state and federal civil rights laws by failing to

---

1. Unlawful employment practices are defined in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1):
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; ... .
 Maryland law contains language identical to that in § 2000e–2(a)(1) with the addition of certain other unlawful employment practices. Maryland Ann.Code, art. 49B, § 16(a)(1) (1979 Repl.Vol., 1983 Cum. Supp.) provides that:
 (a) It shall be an unlawful employment practice for an employer:
 (1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, age, national origin, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment; ...

comply with the strictures of its own affirmative action plan. This case also requires our consideration of whether exhaustion of State administrative and statutory remedies is a prerequisite prior to bringing an action under 42 U.S.C. § 1983, a Federal statute permitting civil actions for alleged deprivations of constitutional or statutory rights.[2]

## FACTS

The following facts may be gleaned from the pleadings and exhibits filed by both parties in the action below.

Commencing in November of 1980, Elsie Crawford, appellee, a white female, was employed by the Maryland-National Capital Park and Planning Commission[3] (the Commission) as a Secretary III. In this capacity Crawford, among other duties, supervised four other Commission employees and was responsible for editing and correcting the work of 29 professionals and four clerical/secretarial employees. Although her performance had been rated Very Good (less than Exceptional but superior to Good), Crawford desired a lateral transfer to a position with less supervisory duties. Such a position became available on August 6, 1982, when the Commission announced recruitment for a Career Merit System Position Administrative Typist III, Grade 10, in the Prince George's County Department of Parks & Recreation

---

**2.** 42 U.S.C. § 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress.

**3.** The Maryland-National Capital Park and Planning Commission is a state-created agency responsible for the preparation and maintenance of a master plan for the physical development of Montgomery and Prince George's Counties. *Donohoe Constr. Co., Inc. v. Montgomery County Council,* 567 F.2d 603, 605 n. 1 (4th Cir.1977), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1148 (1978). Its powers, duties and functions are set out in Article 28 of the Maryland Annotated Code (1983 Repl.Vol.).

History Division. Crawford received a memorandum from a Commission Personnel Technician alerting her to this announcement and encouraging her to apply for this position. Duly interested, Crawford applied.

On September 3, 1982, the Employee Relations and Development Office forwarded 34 applications to Marye Wells, Associate Director of Parks & Recreation, appellant, stating that those 34 applicants were eligible for consideration for the typist position. The list was winnowed to five candidates; Crawford was one of these five candidates. On October 29, 1982, a panel consisting of John M. Walton, Jr., Coordinator of the Commission's History Division, Frances Hagye, Secretary to the Director of Parks & Recreation, and Bianca Floyd, Manager of the Prince George's County Black History Project, interviewed four candidates.[4] Crawford was unanimously selected to be the most fully qualified for the position and was listed by the panel as their first choice. Ranked second was Nadine Callahan, a minority (black) applicant.

Sometime within the following week Walton contacted Wells. Walton explained that Hagye had informed him that the subject position was in a deficient class (job category) which had not met the established goals of a Conciliation Agreement entered into by the Commission with the Equal Employment Opportunity Commission (EEOC). Hagye had further explained to him that Commission Executive Director Thomas H. Countee Jr., appellant, had recently granted a "concurrence" or exception to the EEOC agreement in this employment category and that the next position should be filled by a minority.[5] Walton queried wheth-

_____

4. The fifth candidate did not appear for her interview.

5. We shall refer to the Commission's "concurrence" procedure throughout this opinion. Unfortunately, the documents printed in the joint record extract do not set out the precise course of action involved in this procedure. We are, however, able to surmise the gist of the concurrence procedure from the testimony of the Commission's

er this information meant he was compelled to hire a minority candidate. Wells responded that the EEOC agreement indicated that in order for a non-minority candidate to receive the position, that candidate must be clearly superior to the minority candidate. Wells further stated that the final decision for hiring rested with Countee as the Commission's Executive Director. When asked for his recommendation, Walton indicated that he believed that Crawford, the non-minority candidate, should be offered the position. Wells instructed him to submit a memorandum of the panel's findings. In the meantime, she intended to investigate further the requirements of the EEOC agreement.

On October 29, 1982, the panel, through a detailed memorandum authored by John Walton, forwarded its recommendation to Wells. This memorandum provided six reasons why the panel believed that Crawford was "clearly more qualified" than the second-ranked Callahan.[6] Upon a review of this memorandum, Wells failed to discern a clear explanation for the panel's recommendation of Crawford over Callahan. According to Wells, her further questioning of Walton elicited that the only specific difference between the candidates was that Crawford had more work experience and had worked with the Commission. Wells informed Walton that work with the Commission was not an adequate reason for requesting an exception ("concurrence") to the EEOC conciliation agreement. Wells next spoke with Hagye. Hagye also indicated that Crawford's edge was due to her experience with the Commission. When questioned by Wells as to Callahan's ability to handle the

---

witnesses. We shall elaborate further on this point in part II of this opinion.

**6.** Crawford was deemed to possess greater experience and more highly developed skills in: (1) exercising independent judgment; (2) making administrative decisions; (3) auditing and processing personnel actions, and other forms, records, permits, applications, and documents; (4) maintaining complex clerical records; (5) making mathematical calculations with speed and accuracy; and (6) assisting with the devising and implementation of office procedures.

position, Hagye assured her that Callahan was a good candidate. Wells told Hagye she would continue her review of the applicants and forward her recommendation to the Commission's Director of Parks and Recreation, Hugh B. Robey, appellant, for his approval. Wells recontacted Walton and informed him she would rewrite his memorandum and forward it to Robey.

On November 2, 1982, Wells submitted a memorandum recommending that Callahan be hired for the Administrative Typist III position. Wells identified the vacancy as a deficient class (job category) under the EEOC agreement and Callahan as a minority applicant. Robey approved the recommendation and forwarded it to the Employee Relations and Development Office for processing.

At trial, Crawford testified that she was informed she had been denied the lateral transfer in mid-November. She called Walton to determine why she did not receive the job. Walton explained "it was determined that the last position went to a non-minority on the stipulation that the next two must go to minorities. The position [Crawford] had applied for was the next one." Walton also stated that "[Crawford] has been rejected based upon race because the job had to go to a minority."

### PROCEEDINGS

| | |
|---|---|
| December 15, 1982 | Crawford filed an administrative grievance with the Commission and, pursuant to Commission procedures, requested that the matter be submitted to Director of Parks & Recreation Robey and Executive Director Countee for their findings and recommendations. |
| January 11, 1983 | In a "Grievance Response Form" addressed to Commission Executive Director Countee, Director of Parks & Recreation Robey stated that he had communicated with the interview panel and learned that Crawford was the panel's first choice. He pointed out, however, that the Commission's conciliation agreement with the EEOC mandated the hiring of minorities in "effected classes." As the subject position fell within an "effected class," Robey concurred with Wells' recommendation to hire Callahan over Crawford. |

January 17, 1983 Crawford noted an appeal to Executive Director Thomas H. Countee Jr.

February 10, 1983 Crawford filed a declaration in the Circuit Court for Prince George's County alleging the action of the Commission, Countee, Wells and Robey amounted to racial discrimination in violation of her civil rights as guaranteed by 42 U.S.C. § 1983, the United States Constitution, and the Maryland Constitution. Additionally, Crawford alleged that the Commission, Countee and Wells had conspired to prevent Crawford from appealing the action because of her race. Crawford sought monetary damages and a lateral transfer to the position of Administrative Typist III.

February 14, 1983 Commission Executive Director Countee rendered his opinion denying Crawford's request for transfer. Countee reiterated the facts as previously explained and opined that the "investigation of this grievance revealed no misapplication or misinterpretation of Commission rules, regulations or policies or any arbitrary or capricious action taken against Ms. Crawford."

February 17, 1983 Pursuant to the Commission's Merit System Rules and Regulations, Crawford appealed Countee's decision to the Merit Service Board of the Commission.

March 2, 1983 Appellants filed a demurrer to Crawford's declaration in the Circuit Court for Prince George's County contending that the action was premature in that administrative grievance procedures were pending.

March 7, 1983 A hearing was held on appellants' demurrer before Circuit Court Judge Perry G. Bowen Jr.

April 8, 1983 Judge Bowen overruled appellants' demurrer and ordered that the case be set in for trial forthwith.

April 15, 1983 The Merit System Board affirmed Countee's findings, discerning "no misapplication or misinterpretation of Commission rules, regulations or policies in non-selecting [Crawford] for the vacancy in question because of her race."

A trial on the merits was conducted on June 1 and 2, 1983, before Judge Bowen. In addition to receiving evidence as to the aforementioned facts, Judge Bowen heard the following testimony from Frances Hagye. Regarding Marye Wells' rewriting of the interview panel's hiring recommendation memorandum, Ms. Hagye related that she had never heard of such a practice in her sixteen and a-half years with the Commission. The following colloquy transpired later in Ms. Hagye's testimony:

Q [By appellee's counsel:] Do you know any basis, other than the color of Mrs. Crawford's skin, as to why she wasn't hired?

A Well, under the EEOC agreement, and it was a deficient class, I do not know of any other reason. No.

Q The only reason is the color of her skin, isn't that correct?

A Under the EEOC agreement, I would have to—I suppose that would be the reason, but we had a deficient class here, too, but—

Q Yes, ma'am. But anybody that came in that had the color of her skin couldn't have the job, isn't that correct?

A Is that in my bailiwick? I just—it is a deficient class, so I was under the impression that a class had to be filled by a minority.

Q Yes, ma'am. But that means on your understanding, in response to my colleague's questions, no matter how well qualified this woman is, maybe she is the world's greatest legal stenographer, but with the color of her skin, she couldn't have been hired for this job, could she?

A To the best of my knowledge, I suppose not.

At the conclusion of the trial, Judge Bowen found that:

(a) there was no evidence in the case that the [appellants] intended to violate [Crawford's] rights or deliberately conspired or planned or had any program whereby they were depriving anyone of what was supposed to be due them under law.

(b) the only reason why [Crawford] was not granted a transfer to which she was entitled under the rules and regulations and for which she was clearly the best qualified applicant, was that she was white.

(c) there was no basis for award of punitive damages.

(d) [Crawford] was entitled to $500.00 as award for compensatory damages.

(e) [Crawford] was entitled to injunctive relief directing her transfer to the position of Administrative Typist III.

(f) [Crawford] may be entitled to counsel fees and was granted 30 days to file a petition for award of counsel fees.

| | |
|---|---|
| June 15, 1983 | Appellants noted an appeal to this Court. |
| June 22, 1983 | A hearing was held on Crawford's Petition for Counsel Fees. Crawford's counsel was awarded $24,971.10. |

## THE ISSUES

Appellants ask us to consider:

I. Whether the trial court was in error in not sustaining the Appellants' Demurrer to the Declaration

based on Plaintiff's failure to exhaust administrative remedies prior to filing the action?

II. Whether the employment decisions of the Appellants, taken to implement the Affirmative Action provisions of a Conciliation Agreement with U.S. E.E.O.C., violated a nonminority applicant's Constitutional right to equal protection of law?

III. Whether the trial court having found that the Appellants' had no intent to violate the Appellee's Constitutional or legal rights, erred in granting the injunctive relief and damages?

IV. Whether the trial court erred in exercising jurisdiction to adjudicate the Petition for Award of Counsel Fee after the notice of appeal was filed and the appeal was perfected?

Additionally, the State has filed an *amicus curiae* brief requesting us to hold that a Maryland court is not obliged to entertain an action under 42 U.S.C. § 1983 when the plaintiff has not exhausted administrative and statutory remedies. In their reply brief, appellants have adopted the arguments raised in the State's *amicus curiae* brief. We consider the State's argument to be an offshoot of Issue I raised by appellants. Accordingly, we shall address the points raised by the State in Part I of this opinion.

I. *Failure to Exhaust Administrative and Statutory Remedies*

As detailed in our procedural chronology, Crawford filed her civil action in the Circuit Court for Prince George's County on February 10, 1983. At that time her appeal to Executive Director Countee was still pending. After Countee denied Crawford's request for transfer, Crawford proceeded to file an appeal to the Merit System Board on February 17, 1983. The Merit System Board's decision was not filed until April 15, 1983.

Appellants assert that Judge Bowen should have sustained their demurrer at the March 7, 1983 hearing. They reason that at the time her civil suit was filed, Crawford had not exhausted her administrative remedies. The State, in its *amicus curiae* brief, expresses its concern over the propriety of Maryland courts adjudicating claims based on a Federal statute prior to the exhaustion of State administrative remedies.

The authority to create the Commission's administrative remedial procedures mentioned by appellants and the State are found in Md.Ann.Code, art. 28, § 2–112 (1983 Repl.Vol.). The Commission is required to create a Merit System Board to prepare and recommend comprehensive rules and regulations governing the operation of the Merit System for Commission employees. Section 2–112(a)–(c). Pursuant to this statutory mandate, the Commission adopted in 1976 Merit System Rules & Regulations. Chapter 1700 of those Rules governs Adverse Actions, Grievances and Complaints. Section 1730 provides that any Commission employee "who feels aggrieved for matters relating to his/her job, pay, working conditions, or treatment ... should utilize the Commission Practice, Administrative Grievance Procedure." Chapter 1740 provides that any Commission employee who has a complaint alleging discrimination based on "race, sex, religion, national origin, color, age, or any other non-merit factor may file a complaint of alleged discrimination using the procedures outlined in the Affirmative Action Plan."

The Court of Appeals has stated on numerous occasions that a party must seek redress under statutory procedures established by the Legislature prior to invoking the ordinary general jurisdiction of the courts. *Prince George's County v. Blumberg,* 288 Md. 275, 283–84, 418 A.2d 1155 (1980) (and cases cited therein), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981). Reasons cited for this requirement include: (1) deference to the expertise of administrative agencies; (2) compliance with the Legislature's view that certain claims can best be han-

dled initially by an administrative agency; and (3) abstention from deciding issues which may be resolved by the provided administrative remedy. *Id.*, 288 Md. at 284, 418 A.2d 1155 (*citing Gingell v. County Commissioner*, 249 Md. 374, 376–77, 239 A.2d 903 (1968)).

There are, however, certain exceptions to the exhaustion requirement, which include:

1. When the legislative body has indicated an intention that exhaustion of administrative remedies was not a precondition to the institution of normal judicial action.

2. when there is a direct attack, constitutional or otherwise, upon the power or authority (including whether it was validly enacted) of the legislative body to pass the legislation from which relief is sought, as contrasted with a constitutional or other type issue that goes to the application of a general statute to a particular situation.

3. when an agency requires a party to follow, in a manner and to a degree that is significant, an unauthorized procedure.

4. where the administrative agency cannot provide to any substantial degree a remedy.

5. when the object of, as well as the issues presented by, a judicial proceeding only tangentially or incidentally concern matters which the administrative agency was legislatively created to solve, and do not, in any meaningful way, call for or involve applications of its expertise.

*Id.*, 288 Md. at 284–85, 418 A.2d 1155 (citations omitted). To this list of five, we shall add a sixth exception.

In *Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the Supreme Court expressly held that "exhaustion of State remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Id.* at 516, 102 S.Ct. at 2568. The Court did not treat the issue as one of first impression.

Rather, the *Patsy* decision was an affirmation of the principles set out in *McNeese v. Board of Education*, 373 U.S. 668, 671–72, 83 S.Ct. 1433, 1435, 10 L.Ed.2d 622 (1963). Speaking through Justice Douglas, the *McNeese* Court stated that "relief under [§ 1983] may not be defeated because relief was not first sought under state law which provided a remedy." *Id.* at 671, 83 S.Ct. at 1435. This is so because "[t]he federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Id.* (*quoting Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961)).

Several state courts have interpreted the holding in *Patsy* as permitting § 1983 actions in state courts prior to the exhaustion of state administrative remedies. *Logan v. Southern Cal. Rapid Transit District*, 136 Cal.App.3d 116, 124, 185 Cal.Rptr. 878, 883 (1982); *Jackson v. Inhabitants of Town of Searsport*, 456 A.2d 852, 857 n. 20 (Me.) (dicta), *cert. denied*, —— U.S. ——, 104 S.Ct. 95, 78 L.Ed.2d 101 (1983); *Stratos v. Dep't of Public Welfare*, 387 Mass. 312, 439 N.E.2d 778, 783 (1982); *Montalvo v. Consolidated Edison Company of New York*, 92 A.D.2d 389, 460 N.Y. S.2d 784, 793 (N.Y.1983); *Broadway & 67th Street Corporation v. City of New York*, 116 Misc.2d 217, 455 N.Y.S.2d 347, 353 (N.Y.Sup.1983).

We agree with the reasoning of these cases and, therefore, hold that Crawford was not required to exhaust the administrative remedies provided by the Commission prior to instituting her § 1983 action in the Circuit Court for Prince George's County.

■ We now turn to the State's argument regarding the exercise of jurisdiction by Maryland courts to hear actions brought under § 1983. In *DeBleecker v. Montgomery County*, 48 Md.App. 455, 427 A.2d 1075 (1981), *rev'd on other grounds*, 292 Md. 498, 438 A.2d 1348 (1982), we examined this issue and aligned Maryland with other states which hold that state courts have concurrent authority with federal courts to adjudicate civil rights actions brought

pursuant to 42 U.S.C. § 1983. 48 Md.App. at 458–59, 427 A.2d 1075. The State does not dispute this. Instead, the State urges us to recognize that "a state court has discretion to decline to entertain a Federal cause of action if an otherwise 'valid excuse'[7] exists." In other words, the State wishes us to declare that the State courts may refuse to hear actions such as those brought by Crawford.

The short answer to the State's argument is that the circuit court *could* properly exercise its discretion and entertain jurisdiction of Crawford's § 1983 action. *See, De-Bleecker v. Montgomery County, supra.*

### II. *Affirmative Action*

As of this date, the United States Supreme Court has handed down three decisions dealing with race-conscious affirmative action: *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United Steel Workers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). None of these rulings has entirely resolved this paradoxical issue. Each case is restricted to an examination of a special program [8] and none addresses "the basic constitutional issue of the standard of review that should be employed to determine the compatability of a benign classification with the equal protection guarantee." Nowak, Rotunda & Young, *Constitutional Law* 665 (2d ed. 1983). One legal

---

7. The "valid excuse" doctrine has been viewed appropriate:
 where there exists 'an express and articulated bona fide state policy relating to judicial administration,' which does not discriminate against rights created by federal law and which will not likely be used to frustrate the congressional policy of having federal claims heard in state court.
 Redish & Meunch, *Adjudication of Federal Causes of Action in State Courts,* 75 U.Mich.L.Rev. 311, 358 (1976) (footnotes omitted).

8. *Bakke*—Title VI funding to State medical school; *Weber*—Title VII voluntary affirmative action employment plan by private employer; *Fullilove*—Federal statute dedicated to insuring business opportunities to minorities.

scholar has observed, with respect to the *Bakke* opinions, that the Court's "ambivalent posture" is a "wise and politic resolution to an exceedingly difficult societal problem." P. Mishkin, *The Uses of Ambivalence: Reflections on the Supreme Court and the Constitutionality of Affirmative Action,* 131 U.Pa.L.Rev. 907, 929 (1983).

■ Despite the Supreme Court's "ambivalent posture" in these three cases, we believe it is possible to extrapolate certain general precepts which apply to all affirmative action plans. *Bakke* teaches us, in part, that the Constitution forbids "preferring members of any one group for no reason other than race or ethnic origin," 438 U.S. at 307, 98 S.Ct. at 2757 (separate opinion by Powell, J.). In that case, it was also observed that:

> The difficulty of the issue presented—whether Government may use race-conscious programs to redress the continuing effects of past discrimination—and the mature consideration which each of our Brethren has brought to us have resulted in many opinions, no single one speaking for the Court. But this should not and must not mask the central meaning of today's opinions: Government may take race into account when it acts not to demean or insult any racial group, but to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative or administrative bodies with competence to act in this area.

438 U.S. at 324–25, 98 S.Ct. at 2765–66 (Brennan, White, Marshall & Blackmun, JJ. concurring in the judgment in part and dissenting in part).

*Weber* and *Fullilove* suggest that affirmative action plans which produce discrimination against non-minorities solely on the basis of race, sex or national origin are permissible where strict guidelines and safeguards are established and obeyed. *Weber,* 443 U.S. at 208–09, 99 S.Ct. at 2729–30; *Fullilove,* 448 U.S. at 487–90, 100 S.Ct. at 2779–80.

In *United Steel Workers of America v. Weber, supra,* the High Court examined in the context of Title VII of the Civil Rights Act[9] an affirmative action plan which provided for a degree of racial preference. The United Steel Workers and Kaiser Aluminum Chemical Corporation had voluntarily entered into a collective bargaining agreement which contained, among other things, an affirmative action plan designed to eliminate racial imbalance in what was at the time an almost exclusively white craft-workforce. The plan reserved 50% of the openings in craft-training programs for black employees until the percentage of black craft-workers was commensurate with the percentage of blacks in the local labor force. Weber, a white production worker, filed suit challenging the program after he was passed over for the training program in favor of a less senior black employee. . Weber alleged that the program had resulted in junior black employees receiving preference over similarly situated white employees in violation of Title VII.

The *Weber* Court, speaking through Justice Brennan, held that Title VII did not forbid private employees and unions from "voluntarily agreeing upon bona fide affirmative action plans that accord racial preference in the manner and for the purpose provided" in the plan that was before the Court. 443 U.S. at 200, 99 S.Ct. at 2726. This particular plan did not run afoul of Title VII because of the temporary duration of the plan, the remedial purpose of breaking down the traditional patterns of racial segregation in job classifications, the voluntary nature of the plan, and the fact that the plan did not unnecessarily trammel the interests of white workers because the plan did not "create an absolute bar to the advancement of white employees [because] half of those trained in the program will be white." *Id.* at 208–09, 99 S.Ct. at 2729–30.

---

9. Title VII, 42 U.S.C. § 2000e et seq. provides, *inter alia,* that employers may not hire or discharge any employees on the basis of race, color, religion, sex or national origin.

■ While the *Weber* Court did not expressly state that strict adherence to the affirmative action plan was required, it follows from the Court's reasoning that an affirmative action plan which is not complied with is, in fact, no plan at all. Manifestly, the Supreme Court could not have held the *Weber* affirmative action program permissible had the employers failed to abide by the strict hiring requirements of the program. For it is the affirmative action plan and its faithful execution which sanctifies otherwise impermissible discriminatory employment practices. Therefore, employment practices which depart from the plan's guidelines lose the sanctification provided by a valid affirmative action program.

In *Weber,* the Supreme Court declined to draw "the line of demarcation between permissible and impermissible affirmative action plans." *Id.* at 208, 99 S.Ct. at 2729. Similarly, we need not establish that line nor decide the validity of the Commission's affirmative action plan under the United States Constitution, Title VII or Md.Ann.Code, art. 49B, §§ 14–18 (1979 Repl.Vol., 1983 Cum.Supp.), Maryland's analogue to Title VII. Rather, we perceive the appropriate issue in this case to be whether Crawford's rights were violated due to the discrimination which resulted from appellants' failure to adhere correctly to the EEOC conciliation agreement—that is, failure to follow the Commission's affirmative action plan through use of the concurrence procedure.

### The Case Sub Judice

Appellants assert, as they did below, that all employment decisions regarding Crawford's transfer were guided by their attempt to comply with the affirmative action provisions of the conciliation agreement entered into by the Commission with the EEOC. The conciliation agreement was entered into by the Commission in August 1977 to resolve a complaint filed against it under Title VII of the Civil Rights Act of 1964. The agreement expressly provided that it "does not constitute an admission by the [Commis-

sion] of any violation of Title VII of the Civil Rights Act of 1964...." The Commission agreed that:

all hiring, promotion practices and other terms and conditions of employment shall be maintained and conducted in a manner which does not discriminate on the basis of race, color, sex, religion or national origin in violation of Title VII of the Civil Rights Act of 1964, as amended[;]

and

that it shall make every good faith effort to employ minority group individuals where practicable in each department in all job categories as outlined in the Equal Employment Opportunity Commission State and local Government Information forms (EEO–4) so that by 1980, their representation shall closely approximate, but not be limited to, their representation in the [Standard Metropolitan Statistical Area] workforce.

An EEOC investigation in July 1980 determined that the Commission had not fully complied with the conciliation agreement. Thus, the conciliation agreement was further extended for an additional period of four years commencing from December 16, 1980. In that extension the Commission agreed that:

[U]ntil the goals for black/minority hiring and promotions mutually agreed upon by the Commission and Respondent on December 15, 1980, are met, *one black/minority applicant shall be hired or promoted for each non-minority applicant who is hired or promoted for vacant positions for all job categories pursuant to the Respondent's internal policies and procedures,* submitted to the Commission under Reporting, Section 12 of the Agreement.

(emphasis supplied). The Commission's internal hiring policies and procedures may be gleaned from the trial testimony of its Executive Director, Thomas H. Countee Jr. First, an interview panel makes its hiring recommendation to the appropriate department head. If the position is in a deficient class and the selected candidate is a male or a non-mi-

nority, the department head must submit a memorandum to the Executive Director indicating "clearly and in sufficient fashion why the department head feels the candidate is a clearly superior candidate." This procedure is known, in Commission vernacular, as requesting a "concurrence." The Executive Director's decision may be reviewed by the County Planning Board Chairman. An exhibit introduced into evidence by the Commission revealed that the Executive Director had granted 24 out of 26 requests for concurrence between December 1980 and September 1982.

This procedure was *not* followed in this case. While not following their own personnel procedures, appellants assert that their actions were compelled by the EEOC agreement. Appellants fervently believe that the facts in this case are analogous to those presented in *United Steel Workers v. Weber, supra.* We cannot agree. The plan approved in *Weber* was followed scrupulously. *See,* 443 U.S. at 198–99, 99 S.Ct. at 2724–25. The Commission cannot boast compliance with its plan. Thus, assuming arguendo that the plan is constitutionally sound, the Commission should not be able to use it as a shield from liability for any discriminatory acts.

The Commission's hiring procedures provided for approval or "concurrence" from the Executive Director when the Commission sought to employ a clearly more qualified non-minority over a minority candidate. Yet, Judge Bowen observed:

> You have someone here, someone who was clearly superior and better qualified, but no concurrence was asked for.

> \* \* \* \* \* \*

> The only thing I care about is that nobody asked for concurrence for this candidate although she was in the exact position where she needed one if you were going to comply with [the EEOC agreement], ...

 Testifying for the Commission, Wells provided further evidence of the Commission's failure to comply with its own procedures.

> I found that we had, that the executive director had recently granted two exceptions to our department and that we had stated that the very next position must be filled by a minority.

> \* \* \* \* \* \*

> I looked at what we needed in terms of the position. I looked at the qualifications of both the applicants. I found that, yes, indeed, Mrs. Crawford did have outstanding qualifications. I looked at the fact, also, that the executive director had stated that the next position filled in that classification would have to be filled by a minority.

> \* \* \* \* \* \*

> I also take into consideration the possibility of asking the executive director for a further exception. We had, I had had an experience with that before where I had asked that—we had tried to find a minority for a position that had been designated as a minority position. After three unsuccessful advertisements, which took about six months, we were able to fill the position. At this point I just felt that I was kind of in a Catch-22. I needed to get the job filled, I was looking at the directive of the executive director.[10] I looked at the qualifications, I looked at the needs of the job, and because of business necessity, I made a recommendation that Mrs. Callahan be chosen to fill the position.

Wells' understanding of the Executive Director's directive that the next position must go to a minority does not justify her failure to follow the Commission's procedures by failing to request a concurrence for Crawford's hiring. On cross-examination, Wells admitted that she had never met with Crawford and had never taken the opportunity to determine

---

**10.** The record does not include this "directive" by Executive Director Countee.

whether Crawford possessed the necessary skills and was the clearly superior candidate. This demonstrates that Wells' recommendation was based solely on her predisposition to hire a minority applicant. Moreover, Frances Hagye's testimony regarding the extraordinary practice of rewriting an interview panel's recommendation memorandum serves as additional evidence that the Commission was not adhering to the affirmative action plan.

During closing arguments, appellants' counsel opined, "The facts of this case will have to show that we violated the plan and did not give her the position." In the instant case, ample evidence was adduced to permit Judge Bowen to find that the Commission misapplied its own procedures by hiring a minority applicant over a "clearly more qualified" non-minority applicant for the singular reason of race.

In sum, appellants cannot find succor in any of the relevant Supreme Court cases. In none of those cases did the Court sanction affirmative action plans which created an absolute bar to the employment of non-minority employees. In *Bakke*, Justice Powell stated that race alone may not be the sole factor in a selection process. 438 U.S. at 307, 98 S.Ct. at 2757. The Commission's concurrence procedure reflects this concept by allowing a "clearly more qualified" non-minority candidate an equal opportunity for each available employment position. The Commission's failure to follow that concurrence procedure here runs afoul of the letter and spirit of the policy's purpose to provide equal or near equal consideration. Although the minority candidate was qualified, the trial judge could and did find, in effect, that Crawford, who had superior qualifications, was "foreclosed from all consideration . . . simply because [she] was not the right color. . . ." *Bakke*, 438 U.S. at 318, 98 S.Ct. at 2762 (separate opinion by Powell, J.)

*We do not here today criticize or condemn affirmative action plans generally or the Commission's plan specifically. We emphasize that our holding neither approves nor disapproves the constitutionality of the Commission's plan.* Assuming for the sake of argument that the

plan is constitutional, we hold that Judge Bowen, as trier of the facts, could find that the affirmative action plan was incorrectly applied with regard to Crawford because the appellants failed to adhere to the Commission's own rules. Maryland Rule 1086.

### III. *Injunctive Relief and Damages*

Title VII provides a vehicle for recovering damages under § 1983 for civil rights violations arising out of unlawful employment practices. Title VII states in pertinent part:

> If the court finds that the respondent *has intentionally engaged in or is intentionally engaging in an unlawful employment practice* charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, ...

42 U.S.C. § 2000e–5(g) (emphasis added).

> At the outset of his oral opinion, Judge Bowen said: Let me say at the beginning of these remarks that the court finds no evidence in this case that anybody connected with the Park and Planning Commission intended to do any violations to anybody's rights or deliberately conspired or planned or had any program whereby they were depriving anyone of what was supposed to be due them under the law.

Seizing upon these prefatory extemporaneous remarks, appellants posit that in the absence of a finding of intent to violate Crawford's rights, Judge Bowen erroneously granted appellee injunctive relief and damages.

Appellants have misconstrued the trial judge's comments. While Judge Bowen may have found the appellants did not connive to deny Crawford the transfer because of her race, the point remained that appellants performed intentional acts which they knew would deny Crawford the transfer solely because of her race. Associate Director Wells testified that she was aware of the candidates' races. Her testimony made clear that she intentionally recommended

hiring a minority applicant over a non-minority applicant in a misconceived effort to comply with the conciliation agreement. Executive Director Countee's grievance reply approved of Wells' handling of the matter. In that reply memorandum, Countee wrote:

> Reviewing the situation, Ms. Wells determined that the position was in an EEOC category, (Category 6 clerical) targeted for specific minority hiring goals and that the second choice of the panel was a highly qualified minority applicant. Ms. Wells also knew that just prior to this hiring/promotion opportunity on September 26, 1982, Mr. Countee had concurred in a non-minority selection in this category with the understanding that the Department of Parks and Recreation make every effort to hire a minority in the next vacancy in this category. At the time of the Administrative Typist advertisement the Parks and Recreation Department was still deficient in Category 6 minority employees. *Accordingly, the provisions of the Conciliation Agreement Extension especially the Hiring and Promotion Procedures, provide the compelling reason for the Department to select a highly qualified minority applicant for this position.*

(Emphasis added.) Countee's memorandum underscores the Commission's intentional denial of Crawford's transfer solely due to her race.

For a plaintiff in a Title VII suit to prove *intentional* discrimination, the plaintiff must show that the discrimination was "not accidental, inadvertent or heedless or that it arises from a mistake." *Bradington v. International Business Machines Corp.,* 360 F.Supp. 845, 853 (D.Md. 1973), *aff'd,* 492 F.2d 1240 (4th Cir.1974).[11] Here, Crawford

---

**11.** In *Bradington,* an Arab Egyptian Moslem scientist instituted an action alleging a discriminatory discharge on the basis of his race, religion, color and national origin. The Federal District Court concluded that the scientist was responsible for the discharge and that he had not only failed to demonstrate any discriminatory intent on his employer's part, but that he also failed to show any discrimination in fact.

proved that appellants' discriminatory act with respect to her was deliberate and purposeful and not accidental or inadvertent. The fact that appellants may have acted in good faith is of no moment. In *Albermarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court held that an employer's lack of bad faith did not preclude the plaintiff's recovery of back pay in a Title VII action. "Title VII is not concerned with the employer's 'good intent or absence of discriminatory intent' for 'Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation.'" *Id.* at 422, 95 S.Ct. at 2373 (emphasis in original) (citations omitted).

■ At trial, Crawford proved the intentional nature of appellants' acts. Accordingly, Judge Bowen did not err in awarding her injunctive relief and damages.

## IV. *Jurisdiction*

| | |
|---|---|
| June 13, 1983 | Judge Bowen enjoined appellants to transfer Crawford to the position she sought and entered judgment in favor of Crawford in the sum of $500. Additionally Judge Bowen granted Crawford 30 days to submit a petition for counsel fees.[12] |
| June 15, 1983 | Judge Bowen's Order was filed. Appellants noted an appeal from "the final judgment and Order filed in this case on the 15th day of June, 1983." |
| June 22, 1983 | The trial court ordered that judgment for Crawford's counsel be entered in the sum of $24,971.10 for attorney's fees. At this hearing, appellants asserted that the court was divested of jurisdiction due to the filing of an appeal to the June 15th Order. |

---

**12.** Title 42, U.S.C. § 1988 provides that a court has the discretion to award reasonable attorney's fees to the prevailing party in a § 1983 action. The purpose for this provision is to eliminate the financial barriers to vindication of constitutional rights, to stimulate voluntary compliance with the law, *Seattle School District No. 1 v. Washington,* 633 F.2d 1338, 1348 (9th Cir.1980), *aff'd,* 458 U.S. 457, 487 n. 31, 102 S.Ct. 3187, 3204 n. 30, 73 L.Ed.2d 896, 918 n. 31 (1982), and to compensate those persons who bring meritorious actions, *Pickett v. Milam,* 579 F.2d 1118, 1120 (8th Cir.1978).

June 27, 1983 Judge Bowen reaffirmed his June 22nd Order for attorney's fees and ordered that Crawford be placed in the new job by July 11, 1983.

Interestingly, both parties advance jurisdictional defects. Appellants renew their position that Judge Bowen was without jurisdiction to rule on Crawford's prayer for counsel fees due to their pending appeal on the case's merits. On the other hand, Crawford initially avers that this Court lacks jurisdiction because appellants did not appeal from a final order, and further argues that appellants have failed to preserve for appellate review the issue of attorney's fees because appellants' June 15, 1983 notation of appeal did not encompass the issue of attorney's fees.

(a) *Trial Court's Jurisdiction to Award Attorney's Fees*

■ We discern no error in Judge Bowen's election to rule on the issue of attorney's fees after appellants' appeal had been noted. At the June 22 hearing, the trial judge acknowledged appellants' objection to a ruling on counsel fees, but expressed his belief that it was wiser to award attorney's fees at the time to avoid multiple appeals and to allow an appellate court to review that award.

The Supreme Court has stated that "a request for attorney's fees under § 1988 raises legal issues collateral to the main cause of action." *White v. New Hampshire Dep't of Employment Security,* 455 U.S. 445, 451, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982) (footnote omitted). Therefore, we conclude that Judge Bowen had proper jurisdiction on the collateral matter of attorney's fees after appellants had appealed the Order filed June 15, 1983. *See also Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 52 U.S.L.W. 2480 (7th Cir.1984).

(b) *This Court's Jurisdiction on the Merits of the Case*

▮ Aside from the fact that the judgment of June 15, 1983 awarded damages, an injunction issued. To the extent that the Order was arguably interlocutory, it is clear that an immediate appeal may be filed from "[a]n order ... [g]ranting or dissolving an injunction...." Md.Cts. & Jud. Proc.Code Ann. § 12–303(c)(1). Accordingly, this Court has jurisdiction.

(c) *This Court's Jurisdiction to Entertain Appellants' Argument on Attorney's Fees*

▮ In the June 13th Order, Judge Bowen "ordered, that plaintiff is granted thirty (30) days from the date of this Order to submit a petition for counsel fees...." Thus, the trial judge explicitly retained jurisdiction over the issue of attorney's fees for a period of at least 30 days. The noting of an appeal divests the trial court only on issues which are appealed. *Link v. Link,* 35 Md.App. 684, 686, 371 A.2d 1146 (1977) (and cases cited therein). In that appellants failed to appeal from the trial court's Orders of June 22 and June 27, they have failed to preserve the issue of attorney's fees for appellate review. *See,* Maryland Rule 1012.

We dismiss any argument that appellants' June 15th notation of appeal included the court's impending award of attorney's fees. Manifestly, no appeal could be taken on an issue which had yet to be decided.

▮ Even assuming arguendo that the issue were properly before us, we would uphold the trial court's awarding of attorney's fees and the amount of fees awarded. Memoranda in favor and in opposition to the amount of fees to be awarded were filed by trial counsel. Both parties had an opportunity to argue their views to the trial judge. Finally, Judge Bowen meticulously articulated his method of arriving at the proper award for this case by touching on each of

the twelve considerations outlined in the case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).[13] The trial judge weighed each consideration and concluded that five of the factors merited the award of a modest bonus to the basic fee for the case. Judge Bowen also added the court costs expended by Crawford's counsel. Another fact which exemplified the careful approach taken by the trial judge was that the award ordered was *less* than the amount requested by Crawford's counsel. Accordingly, if the issue had been presented for appellate review, we would hold that Judge Bowen did not abuse his discretion in determining the counsel fees to be awarded.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.

---

**13.** Those 12 considerations are: time and labor required; novelty and difficulty of questions; skill required to perform legal service properly; preclusion of other employment due to acceptance of this case; customary fee; whether fee is fixed or contingent; time limitation imposed by client or circumstances; amount involved and results obtained; experience, reputation and ability of attorney; "understandability" of the case; nature and length of the professional relationship with the client; and awards in similar cases.