471 A.2d 693

MARYLAND STATE DEPARTMENT OF PERSONNEL et al.

v.

Donald B. SEALING II, Successor in Interest for John T. Sealing.

No. 157, Sept. Term, 1982.

Court of Appeals of Maryland.

Feb. 21, 1984.

Diana G. Motz, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Robert A. Zarnoch and George A. Eichhorn, Asst. Attys. Gen., Baltimore, on brief), for appellants.

Craig S. Garfield, Baltimore (Cohen, Dwin & Garfield, P.A., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

DAVIDSON, Judge.

This case involves an action for judicial review of a decision of the Secretary of the Maryland State Department of Personnel (Secretary) to remove a correctional officer at the Maryland House of Correction from State service.

On 17 October 1980, John T. Sealing (Sealing), a permanent classified State employee then serving as a correctional officer at the Maryland House of Correction, a constituent institution of the Department of Public Safety and Correctional Services, Division of Correction, was suspended by the

Warden of that institution pending the filing of charges with the Secretary for Sealing's removal from State service pursuant to Md.Code (1957, 1983 Repl.Vol.), Art. 64A, § 36,[1] Art. 64A, § 33,[2] and Code of Maryland Regulations (CO-MAR) 06.01.01.48.[3] On 20 October 1980, the Warden filed written charges against Sealing alleging violations of CO-MAR 06.01.01.47 E and M, and then Division of Correction Regulation 50–2, Standards of Conduct, Rule 4 (DCR 50–2 IV.A.4.).

COMAR 06.01.01.47 provides in pertinent part:

".47 Causes for Removal.

"Any employee in the classified service may be permanently removed from his position only for cause. . . . The following shall be sufficient cause of removal, though removal may be for causes other than those enumerated:

· · · · ·

---

1. Art. 64A, § 36 provides in pertinent part:
   "The appointing authority may for disciplinary purposes suspend an employee. Every such suspension shall be without pay; provided, however, that any employee who is suspended by the appointing authority may appeal his suspension to the Secretary of Personnel. . . ."

2. Art. 64A, § 33 provides in pertinent part:
   "No employee who has completed this probation may be permanently removed from the classified service except for cause, upon written charges and after an opportunity to be heard in his own defense. . . . [S]uch charge shall within ninety days after filing, be heard, investigated and determined by the Secretary or by some person or board appointed by the Secretary to hear, investigate and determine the same.

   · · · · ·

   "The finding and decision of the Secretary or of such person or board when approved by the Secretary shall be final, and shall be certified to the appointing authority and shall be forthwith enforced by such authority."

3. COMAR 06.01.01.48 provides in pertinent part:
   "A. . . . The appointing authority . . . may file with the Secretary charges for removal of a classified employee. The charges . . . shall inform the employee that he may appeal the charges within 10 calendar days after his receipt of the charges."

"E. That the employee has been wantonly offensive in his conduct toward fellow employees, wards of the State, or the public;

. . . . .

"M. That the employee has been guilty of conduct such as to bring the classified service into public disrepute."

DCR 50–2 IV.A.4. then provided in pertinent part:

"A. All employees . . . must abide by the following rules of conduct established by the Commissioner. . . . Violations of this regulation and the stated rules of conduct, whether through ignorance, carelessness, or willful action, will be considered grounds for disciplinary action, possible criminal action, and/or removal from State service.

. . . . .

"4. . . . Employees on and off duty must conduct themselves in a manner which will maintain the respect of the public and the inmate body. Conduct which reflects unfavorably upon the division by causing embarrassment or criticism will constitute grounds for disciplinary action."[4]

The specific incident precipitating these charges was described as follows:

"On [10/16/80], Officer John Thomas Sealing brought a handout into this institution, that he had received in the mail, to show to his friends.

"The handout contained racial slurs, nicknames and discriminatory remarks of the most explosive nature.

---

4. Effective 1 July 1981, DCR 50–2 IV.A.4. was revised. That regulation now provides in pertinent part:

"4. . . . Every employee shall conduct him or herself at all times, both on and off duty, in such a manner as to reflect most favorably on the Division of Correction. Conduct unbecoming an employee shall include that which tends to bring the Division of Correction into disrepute, or reflects discredit upon the employee as a representative of the Division, or that which tends to impair the operation or efficiency of the agency or employee."

"This type of material is considered to be racially inflammatory and could cause serious problems and possible riot, when circulated in a prison environment."

Although the charges were filed for the purpose of removing Sealing from State service, an Unsatisfactory Report recommending that Sealing be given another chance in some other department was simultaneously filed.

Sealing appealed to the Secretary. On 17 November 1980, a hearing was held before a hearing officer designated by the Secretary. The evidence adduced at this hearing showed that in October 1980, Sealing was a permanent classified employee serving as a correctional officer at the Maryland House of Correction. At that time, 90 percent of the inmate population and 40 percent of the staff were black. Tension was present because the institution was then somewhat overcrowded.

The evidence further showed that on 15 October 1980, Sealing received an anonymous letter that read as follows:

"MARYLAND GAME COMMISSION

Department of Natural Resources Tawes Building
Annapolis, Maryland 21401

Dear Fellow Maryland Hunters:

The 1980–81 Big Game Season in the State of Maryland will be cancelled due to a shortage of Big Game animals. The following game animals will not be hunted: Bear, Deer and Turkey.

However, in the place of Big Game Animals, there will be an open season on Jungle Bunnies (known regionally as Negro, Nigger, Saucerlips or Pittsburg Pirates). The season will be open from Nov. 1 thru April 30, 1981. It must be remembered, fellow hunters, 'The only good nigger is a dead one.'

*It will be unlawful to:*

1. Hunt in a party of over 150.
2. Use more than 35 blood thirsty hounds.

3. Shoot in public bars (the bullet may richochet off the head and injure a white person.

4. Shoot any nigger while in a Cadillac.

TRAPPING REGULATIONS

1. Traps may not be set within 15 feet of a watermelon patch.

2. Traps may not be baited with pork chops, watermelon, cheap whiskey or wine, fried chicken or flashy clothes.

NOTE: A special permit may be issued for the use of Cadillac keys.

3. Traps may not be set in ghetto areas.

4. All traps must have 400-lb. spring and 4-inch jaw spread.

OTHER RULES AND REGULATIONS

1. It is unlawful to pick up or possess a road-killed Jungle Bunny. If you see one on the highway, you may hit it, but don't pick it up.

2. It is unlawful to use any recorded or electronically amplified device to trap a Jungle Bunny, with exception of the following: a recording of Al Jolson's 'Swanee River' or 'Dixie'.

NOTE: A special permit may be purchased to use: 'Mama's Little Baby Loves Shortening Bread.'

HOW TO KNOW WHEN JUNGLE BUNNIES ARE IN THE AREA:

Watermelon seeds on ground; smell of pork chops in air; Cadillacs, especially with white sidewalls; nigger wool in tree branches; a pile of carp bones next to your favorite fishing hole.

LIMIT: 3 per day, 40 per season.

LICENSE FEE: Free to all whites.

Safe and Happy Hunting"

On 16 October 1980, Sealing brought the letter to work and showed it to other staff members including some supervisory personnel. Although Sealing did not reproduce the letter or show it to any inmates, copies of it were made and left on a desk that was accessible to both inmates and correctional officers. Five or six copies were taken from the desk but it was unknown whether inmates or officers had taken the copies.

Later that day, a correctional officer, who "thought it wasn't right for this type of document to be passed around in the institution," brought the letter to the attention of one of Sealing's immediate supervisors. That supervisor described the letter as "inappropriate and inflammatory in the confines of a correctional institution where approximately 90%, 85–90% of the population is black, where correctional officers have to supervise these people and control them." He further stated that "with this type of document circulating through the institution, it could cause a hardship on white correctional officers that are trying to perform their job as far as if they have an incident with an inmate, the first thing the inmate would allege is that the officers instead of doing his job is doing it because he's a racist and refer back to that document being passed around." That supervisor informed yet another supervisor of the letter and its contents. The second supervisor felt "that the hand-out that was brought in was extremely racist, extremely dangerous in that type of situation" and "that such a document was bound to cause some type of trouble between the officers and inmates." Although this supervisor had not observed any problems resulting from the dissemination of the letter, he nonetheless recommended that Sealing be disciplined.

After the Warden suspended Sealing, an inmate, who was then serving as a representative on the Inmate Advisory Council,[5] told one of Sealing's supervisors that a correctional

---

**5.** The Inmate Advisory Council is comprised of inmates elected from different sections of the institution. It serves as a liaison between the inmate population and the supervisory staff.

officer other than Sealing had shown him the letter. The inmate indicated that there "would be no problem from the inmate population because the warden took action."

In his defense, Sealing testified that because hunting was one of his hobbies, he found the anonymous letter "rather amusing." He stated that his purpose in bringing the letter to work was to show it to friends with whom he hunted. He said that he had shown the letter to one black and several white members of the staff, including some supervisory personnel. According to Sealing, staff reactions were mixed—some staff members chuckled while others made no comment.

Although Sealing stated that at the time of the incident he was aware of his obligation to be extremely careful to avoid any conduct that might proliferate existing problems, he testified that he was not then aware that he was violating any institutional rule. He said that in the past, pictures with sexual and racial overtones had been posted in areas frequented by staff, minimum security inmates, and persons making deliveries to the institution. He asserted that racial epithets were frequently exchanged between black and white inmates and staff. Finally, Sealing pointed out that it was not until six days after his suspension that the Warden issued an informational bulletin indicating that printed materials containing racial slurs should not be brought into the institution.[6]

Based upon the evidence presented, the hearing officer made the following findings of fact, in pertinent part:

---

**6.** Maryland House of Correction Information Bulletin # 204, dated 23 October 1980, reads as follows:

"Effective immediately, printed materials containing racial slurs, nicknames and discriminatory remarks of any nature are not to be brought into the Maryland House of Correction for any reason. These materials not only are a show of poor taste but are also in violation of D.C.R. # 50–2—Standards of Conduct.

"Any violation of this policy will result in stringent disciplinary action."

"1. Mr. Sealing did bring the complained of document into the Maryland House of Correction.

2. He distributed the document to a number of Correctional Officers while on duty at the institution.

3. On its very face the document is odious and scurrilous.

4. The Division of Corrections, through the Department of Public Safety and Correctional Services, is by law charged with the management of the Maryland House of Correction and the safe custody of the inmates confined therein.

5. Mr. Paul J. Davis is the legally appointed Warden of the Maryland House of Corrections and as such, is immediately responsible to higher level officials of the Division of Corrections to fulfill the mission stated above.

6. The Warden determined that the document could cause serious problems and possible riot when circulated in a prison environment, because, in his opinion, the document is racially inflammatory."

Additionally, the hearing officer determined that "[p]ast practice within an institution cannot alter the provisions of Division, Departmental or Statewide regulations or policies." He concluded that Sealing had violated COMAR 06.01.01.47 E and M, as well as DCR 50–2 IV.A.4.

On 16 December 1980, these findings and conclusions were approved by the Secretary who ordered that Sealing "be permanently removed from State service," but that "in accordance with the recommendation of the appointing authority," Sealing "be given another chance in some other department of the State."

Sealing filed an appeal in the Circuit Court for Howard County pursuant to Md.Code (1957, 1982 Repl.Vol.), Art. 41, § 255(a).[7] In a Memorandum Opinion, the trial court initial-

7. Art. 41, § 255(a) provides:

ly found that the administrative determination that Sealing had violated COMAR 06.01.01.47 E was not supported by sufficient facts and inferences. More particularly, with respect to the alleged violation of that regulation, the trial court said:

"To sustain disciplinary action under COMAR 06.01.01.-47(E) . . . facts have to be found from which a reasoning mind could conclude that Appellant's conduct had been 'wantonly offensive' toward fellow employees, inmates, or the public. . . .

"That the material was offensive is admitted. But the mere fact of its offensive nature does not, absent more, cause Appellant's conduct to be 'wantonly offensive'. Inherent in wanton conduct is some act which is so reckless or grossly negligent, as regards the rights and feeling of others, that one of a reasoning mind may infer an intent to be offensive or to do harm. Wanton conduct goes beyond conduct which is merely careless or thoughtless."

The trial court then found that the administrative determination that Sealing had violated COMAR 06.01.01.47 M was not supported by sufficient facts and inferences. Additionally, the trial court found that Sealing had not been charged with a violation of DCR 50–2 IV.A.4. The trial court concluded that the administrative action removing Sealing from State service was arbitrary and capricious. On 11 December 1981, the trial court entered an order remanding the case to the Secretary for further proceedings in accordance with its opinion.

An appeal was filed in the Court of Special Appeals. In an unreported per curiam opinion, *Maryland State Department of Personnel v. Sealing*, No. 97, September Term, 1982, filed 8 October 1982, that Court determined that Sealing had been properly charged with a violation of DCR 50–2 IV.A.4. It found, however, that there was insufficient evidence in

---

"(a) *Right to review.*—Any party aggrieved by a final decision in a contested case, whether such decision is affirmative or negative in form, is entitled to judicial review thereof under this subtitle."

the record to support the finding of a violation of DCR 50–2 IV.A.4 or COMAR 06.01.01.47 E and M. More particularly, with respect to the alleged violation of COMAR 06.01.01.47 E, that Court said:

"The paper certainly is offensive, as testified to by Lt. Clay who thought it 'inappropriate and inflammatory,' and Major Dettler, who considered it 'extremely racist' in nature. To be violative of the regulation, however, it is not the paper itself but Sealing's 'conduct toward fellow employees, wards of the State, or the public . . .' that must be judged as wantonly offensive. 'An offensive act that is "wanton" is brutally insolent or heedless of the rights and feelings of others.' *Thompson v. City of Minneapolis,* 300 N.W.2d 763, 769 (Minn.1980).

"While Sealing was later told by a superior officer that the paper could be 'extremely dangerous' if circulated among the inmates, Sealing did not intend to circulate it among the inmates. As noted, he intended to show it only to a few of his fellow correctional officers who, he thought, might (and did) find it 'rather amusing.' Although Sealing admitted in retrospect that his limited distribution of the paper was in poor taste, his conduct 'toward fellow employees, wards of the State, or the public,' as such, cannot be characterized as wantonly offensive." *Sealing,* No. 97, September Term, 1982, slip op. at 5.

The Court of Special Appeals concluded that the administrative action removing Sealing from his duties as a correctional officer was arbitrary and capricious. Accordingly, the judgment of the trial court was affirmed.

A petition for a writ of certiorari was filed that we granted. We shall reverse the judgment of the Court of Special Appeals.

The applicable standard for judicial review of a decision of the Secretary of the Maryland State Department of Personnel is set forth in the Administrative Procedure Act, Md.

Code (1957, 1982 Repl.Vol.), Art. 41, § 255(f). That section provides in pertinent part:

"(f) *Affirmance, remand, reversal or modification of decision.*—The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

.     .     .     .     .

"(5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or

"(6) Arbitrary or capricious."

The principles governing the application of that standard have been frequently articulated by this Court. *E.g., Courtney v. Board of Trustees of the Maryland State Retirement Systems,* 285 Md. 356, 362, 402 A.2d 885, 889 (1979); *Resetar v. State Board of Education,* 284 Md. 537, 553–54, 399 A.2d 225, 233–34, *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979); *Oxon Hill Recreation Club, Inc. v. Water Resources Administration,* 281 Md. 110, 113–14, 375 A.2d 567, 569 (1977). Illustrative is *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512–13, 390 A.2d 1119, 1123–24 (1978), in which this Court said:

" 'Substantial evidence,' as the test for reviewing factual findings of administrative agencies, has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' The scope of review 'is limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'

"In applying the substantial evidence test, we have emphasized that a 'court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken.' We also must review the agency's decision in the light most favorable to the agency, since 'decisions of administrative agencies are prima facie correct,' and 'carry with

them the presumption of validity.' Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." (Citations omitted) (emphasis in original). We shall apply these principles here.

■ The petitioner initially contends that the record contains substantial evidence to support the Secretary's decision that Sealing violated COMAR 06.01.01.47 E because his conduct toward fellow employees, wards of the State or the public was "wantonly offensive." We agree.

Although this Court has not previously interpreted the term "wantonly offensive" conduct appearing in COMAR 06.01.01.47 E, we have frequently construed the term "wanton" in other contexts. *Griffin v. State,* 225 Md. 422, 429, 171 A.2d 717, 720 (1961), *rev'd on other grounds,* 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964); *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 617, 56 A.2d 813, 817 (1948); *Baltimore Transit Co. v. Faulkner,* 179 Md. 598, 602, 20 A.2d 485, 488 (1941); *Philadelphia, Wilmington & Baltimore R.R. v. Hoeflich,* 62 Md. 300, 309 (1884); *Moore v. Schultz,* 31 Md. 418, 423 (1869); *see St. Paul at Chase Corp. v. Manufacturers Life Insurance Co. of Toranto,* 262 Md. 192, 238–39, 278 A.2d 12, 34, *cert. denied,* 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971). Thus, as early as 1869, this Court in *Moore v. Schultz,* 31 Md. 418, 423 (1869), defined "wanton" conduct as conduct committed in a manner indicating a "disregard of the rights of others." Thereafter, in *Baltimore Transit Co. v. Faulkner,* 179 Md. 598, 602, 20 A.2d 485, 488 (1941), and *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 617, 56 A.2d 813, 817 (1948), this Court defined "wanton" conduct as conduct "characterized by extreme recklessness and utter disregard for the rights of others."

The same definition was applied by this Court in a criminal case, *Griffin v. State,* 225 Md. 422, 429, 171 A.2d 717, 720 (1961), *rev'd on other grounds,* 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), in which we construed a predecessor to

Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 577. That criminal statute, then entitled "Wanton trespass upon private land," Md.Code (1957), Art. 27, § 577 [8] provided in pertinent part:

> "Any person ... who shall enter upon or cross over the land, premises or private property of any person ... after having been duly notified by the owner or his agent not to do so shall be deemed guilty of a misdemeanor ...; provided [however] that nothing in this section shall be construed to include ... the entry upon or crossing over any land when such entry or crossing is done under a bona fide claim of right or ownership ..., it being the intention of this section only to prohibit any *wanton trespass* upon the private land of others." (Emphasis added.)

In determining that the trespass there involved was "wanton" conduct within the meaning of the statute, this Court said:

> "Although there are almost as many legal definitions of the word 'wanton' as there are appellate courts, we think the Maryland definition, which is in line with the general definition of the word in other jurisdictions, is as good as any. In *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 56 A.2d 813 (1948), as well as in *Baltimore Transit Co. v. Faulkner,* 179 Md. 598, 20 A.2d 485 (1941), it was said that *the word 'wanton' means 'characterized by extreme recklessness and utter disregard for the rights of others.'* We see no reason why the refusal of these appellants to leave the premises after having been requested to do so was not wanton in that their conduct was in 'utter disregard for the rights of others.' " *Griffin,* 225 Md. at 429, 171 A.2d at 720 (emphasis added).

We shall apply the traditional Maryland definition of the term "wanton" conduct here. Thus, under COMAR 06.01.-01.47 E, conduct by an employee that is characterized by extreme recklessness and utter disregard for the rights of

---

**8.** Subsequent amendments of Art. 27, § 577 made no changes relevant here.

fellow employees, wards of the State or the public constitutes sufficient cause for removal from State service.

■ The record in this case shows that at the time of the relevant incident, 90 percent of the inmates and 40 percent of the staff at the Maryland House of Correction were black. Tension was present in the institution because of overcrowding. Sealing was then aware of his obligation to be extremely careful to avoid any conduct on his part that might proliferate existing problems. Nevertheless, Sealing intentionally brought a letter into the institution that called for "an open season on Jungle Bunnies," and admonished that "[t]he only good nigger is a dead one." Sealing not only displayed this letter to staff members, but also negligently permitted it to be reproduced and negligently allowed copies to be left on a desk accessible to both inmates and correctional officers.

The record further shows that one correctional officer indicated that he "thought it wasn't right for this type of document to be passed around in the institution." One supervisor described the letter as "inappropriate" and "inflammatory" in a correctional institution in which 90 percent of the inmate population was black. He opined that such a document "could cause a hardship on white correctional officers that are trying to perform their job." Still another supervisor felt that the letter was "extremely racist" and "extremely dangerous," and that "such a document was bound to cause some type of trouble between the officers and inmates." The Warden determined that the letter "contained racial slurs, nicknames and discriminatory remarks of the most explosive nature." He concluded that "[t]his type of material is considered to be racially inflammatory and could cause serious problems and possible riot, when circulated in a prison environment." An inmate who was then a member of the Inmate Advisory Council explained that there "would be no problem from the inmate population because the warden took action," thus inferring that the

only reason there had been no inmate repercussions was the Warden's prompt suspension of Sealing.

This evidence was adequate to support the conclusion that Sealing's conduct was characterized by extreme recklessness and utter disregard for the rights of fellow correctional officers and inmates. Thus, there was substantial evidence from which a reasoning mind reasonably could have concluded that Sealing's conduct toward fellow correctional officers and inmates was wantonly offensive and constituted sufficient cause for Sealing's removal from State service. *Cf. Resetar,* 284 Md. at 554–55, 399 A.2d at 234–35 (use of racial epithets by school teacher constituted misconduct). Under the present circumstances, the Secretary's decision was supported by substantial evidence and was not arbitrary or capricious.[9] Accordingly, the judgment of the Court of Special Appeals shall be reversed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED.

CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE CIRCUIT COURT FOR HOWARD COUNTY AND TO REMAND THE CASE TO THAT COURT FOR ENTRY OF AN ORDER IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID BY RESPONDENT.

---

9. In view of our decision, we need not consider whether there was substantial evidence to support the Secretary's determination that Sealing had violated COMAR 06.01.01.47 M and DCR 50–2 IV.A.4.