752 A.2d 686

George STOVER

v.

PRINCE GEORGE'S COUNTY, Maryland.

No. 775, Sept. Term, 1999.

Court of Special Appeals of Maryland.

June 2, 2000.

378

Benjamin R. Wolman and Lynae Turner, Upper Marlboro, for appellant.

Robert J. Mellin, Associate County Atty. (Sean D. Wallace, County Atty., on the brief), Upper Marlboro, for appellee.

Argued before WENNER, HOLLANDER and KENNEY, JJ.

KENNEY, Judge.

Appellant, George Stover, was employed by the Prince George's County Department of Corrections ("the Department"), holding the rank of corporal. The Department charged appellant with eleven violations of the Department's regulations and of the Prince George's County Personnel Law. Appellant requested that an Administrative Hearing Board ("the Board") review these charges. The Board convened on

June 26, 29, 30, and July 17, 1998, and found appellant guilty of eight of the charges and not guilty of three. The Board recommended penalties for each of the eight violations; for four of the violations, the recommended penalty was dismissal.

Appellant was dismissed by the Department on August 7, 1998. He appealed the Board's findings to the Circuit Court for Prince George's County. Oral argument on the case was heard on May 14, 1999, and the court subsequently affirmed the Board's findings. Appellant appeals from that ruling.

### Facts

Except for periods from 1980 to 1983, and 1987 to 1990, appellant was employed by the Department from January 1978 to August 7, 1998. Immediately before his dismissal from the Department, he worked at the Prince George's County Correctional Center ("the facility"). Appellant's alleged violations of the Department's regulations and of the County's personnel law were:

*Charges 1–3:* delivering contraband to inmates Nicole Lancaster, Yassmin Lindo, and Debra Anderson.

*Charge 4:* granting or promising to inmate Nicole Lancaster special privileges or favors not available to all inmates.

*Charges 5–7:* improper fraternization with inmates Lancaster, Lindo, and Anderson.

*Charge 8:* committing an act or series of acts which have had or may be reasonably demonstrated to have an appreciable effect on the general public's confidence and/or trust in the Department.

*Charge 9:* failure to obey an order of a superior officer.

*Charges 10–11:* making false statements to investigators.

The Board found appellant not guilty of Charges 2, 10, and 11, but guilty of the other eight violations. Its recommended penalties for those eight violations were: for Charge 1, suspension for ten working days; for Charge 3, suspension for ten working days; for Charge 4, a fine of $150; for Charge 5,

a fine of $150; for Charge 6, dismissal; for Charge 7, dismissal; for Charge 8, dismissal; and for Charge 9, dismissal.

The Department's Policy and Procedure Manual, pursuant to the County's personnel law, provides that the Director of the Department has the authority to make the final determination on all disciplinary actions. The Director issued a Disciplinary Action Memorandum on August 7, 1998. The Director concurred with the Board's factual findings and acted in accordance with the Board's recommended penalties, dismissing appellant effective immediately. Because of appellant's dismissal, the Director set aside the recommended suspensions and fines.

### Issues Presented

Appellant presents three issues for our review:

1. Whether the circuit court erred in affirming the findings of the administrative hearing board as to contraband, fraternization, and an act affecting the public trust despite the absence of substantial evidence to support those findings?

2. Whether the circuit court erred in affirming the decision of the administrative hearing board that George Stover failed to obey a lawful order even though the order violated George Stover's constitutional rights?

3. Whether the circuit court erred in affirming the administrative hearing board's excessive, arbitrary, disparate and capricious penalties?

We find no error and shall affirm.

### Discussion

#### 1.

#### Standard of Review

When reviewing a decision of an administrative agency, this Court's role is "precisely the same as that of the circuit court." *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–304, 641 A.2d 899 (1994)

(citation omitted). "Judicial review of administrative agency action is narrow. The court's task on review is *not* to 'substitute its judgment for the expertise of those persons who constitute the administrative agency.'" *United Parcel Service, Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–577, 650 A.2d 226 (1994) (quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119 (1978)).

Rather, "[t]o the extent the issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test." *Department of Health and Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 602, 657 A.2d 372, *cert. denied,* 340 Md. 215, 665 A.2d 1058 (1995) (citation omitted). The reviewing court's task is to determine "whether there was substantial evidence before the administrative agency on the record as a whole to support its conclusions." *Maryland Commission on Human Relations v. Mayor and City Council of Baltimore,* 86 Md.App. 167, 173, 586 A.2d 37, *cert. denied,* 323 Md. 309, 593 A.2d 668 (1991). The court cannot substitute its judgment for that of the agency, but instead must exercise a "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." *State Administration Board of Election Laws v. Billhimer,* 314 Md. 46, 58–59, 548 A.2d 819 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989) (quoting *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625, 547 A.2d 190 (1988)).

The reviewing court's analysis has three parts:
1. First, the reviewing court must determine whether the agency recognized and applied the correct principles of law governing the case. The reviewing court is not constrained to affirm the agency where its order "is premised solely upon an erroneous conclusion of law."
2. Once it is determined that the agency did not err in its determination or interpretation of the applicable law, the reviewing court next examines the agency's factual findings to determine if they are supported by substantial evidence,

*i.e.,* by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. At this juncture, ... "it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference."

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is "whether, ... a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]."

*Comptroller of the Treasury v. World Book Childcraft Int'l, Inc.,* 67 Md.App. 424, 438–439, 508 A.2d 148, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986) (quoting *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 834–838, 490 A.2d 1296 (1985)).

### Charges 1 and 3

 The Department's Policy & Procedure Manual ("the Manual") defines "contraband" as:

Any item, material, substance, or other thing of value that is not authorized for inmate possession by the Director or his Designee or is brought into the facility in a manner prohibited by departmental policy and procedure.

Section 3.2(IV)(B)(3) of the Manual provides: "Contraband will not be given or made accessible to inmates. Anything not issued to inmates or authorized for their use will be considered contraband." In this context "contraband" has no criminal connotation.

Appellant was found to have violated this provision by handing out certain cards to Nicole Lancaster and Debra Anderson at the facility. Both appellant and appellee describe these cards as "business cards," but appellant also calls them "ministerial cards." Appellant is a lay minister in his church,

Restoration Temple. The cards, apparently in the size and shape of standard business cards, listed the name of appellant's church and the phone number that appellant uses for ministerial functions. This number rings at appellant's home, but it is a different line than that used by appellant and his family for personal calls.

At the Board hearing, Nicole Lancaster testified that, while she was an inmate at the facility, appellant gave her "a business card for Minister Stover" with a phone number on it.

Debra Anderson testified that she was incarcerated at the facility several times during 1997 and 1998. She answered affirmatively when she was asked if appellant gave her "a business card." She testified that the card had appellant's name and phone number on it; she did not notice if it referred to him as a minister.

Appellant testified that he has given inmates his business/ministerial cards.

Based upon the testimony of these witnesses, we hold that the Board had substantial evidence upon which it could find appellant had given inmates "contraband" as that term is defined in the Department's Manual.

*Charge 4*

 Section 3.2(B)(4) of the Manual provides: "Personnel will not grant or promise to an inmate special privileges or favors not available to all inmates."

At the Board hearing, Ms. Lancaster testified that on the day she was released from the facility, but before her release, appellant allowed her to use an office phone at the facility to call her mother in Utah and a cousin at an undisclosed location "so I could have someone come and sign me out." Ms. Lancaster testified that appellant used a phone card, apparently his own, to make the call.

Appellant testified that he allowed Ms. Lancaster to use his phone card so she could arrange for family members to meet her. He testified that at the facility employees of all ranks

frequently arrange for phone calls for inmates who are their family members or friends. He testified that there was nothing untoward about the assistance he gave Ms. Lancaster. Indeed, appellee has not alleged any harm that could be attributed to appellant's actions regarding Ms. Lancaster's phone calls. Having said that, we hold that there was sufficient evidence presented for the Board to conclude that appellant granted Ms. Lancaster "special privileges or favors not available to all inmates." There was no showing that preferential treatment of inmates by the facility's employees was pervasive and that it was officially tolerated by the Department. Regardless of whether some other employees may have granted preferential treatment to inmates, the Board did not err by finding appellant violated this provision.

*Charge 5–7*

Section 3.2(IV)(C)(3) of the Manual provides: "Personnel will not establish a personal relationship with an inmate or an inmate's spouse, relative, or friend, beyond what is required to perform official duties. Personnel will not use their position to become intimately involved with inmates or their visitors."

Appellant was found guilty of violating this provision in reference to his interactions with three female inmates: Nicole Lancaster, Yassmin Lindo, and Debra Anderson. At the hearing, Ms. Lancaster testified that after she was released from the facility, she stayed with a cousin in Fort Washington and then moved to appellant's house, where she and her nine-year-old son had a room in the basement. She testified that "I have never had any romantic feelings or thoughts for Mr. Stover, but he had them for me." She was aware of appellant's feelings because he told her he loved her and asked her to marry him. She testified that she was uncomfortable at appellant's house "because of the feelings that he had for [her]," so she left to visit her family in Pennsylvania and to find another place to live. Her departure initially was amicable, according to her, but, when it became apparent that she would not return, her relations with appellant became more

strained. She testified that, after a fire occurred at appellant's house while she was visiting her family, appellant put her belongings in storage and had not, at the time of the hearing, returned them to her.

Yassmin Lindo testified that she met appellant in 1992 through Restoration Temple. She was incarcerated at the facility in 1997 and 1998, and she testified that appellant arranged with her Probation Officer, John Parrish, for her to be released into his custody. Ms. Lindo testified that appellant, on his own initiative, told Mr. Parrish she was his goddaughter. After leaving the facility she lived at appellant's house, in her own room, for approximately three weeks. While she was there, appellant gave her gifts: "a bathrobe with matching slippers and perfume set," as well as "a dress and earrings and shoes." Ms. Lindo left appellant's house after three weeks because she felt uncomfortable there. She testified that she did not leave on good terms and that she had not received all of her possessions from appellant's house.

Debra Anderson testified that she met appellant while she was incarcerated at the facility in 1997. She testified that she placed calls from the facility to appellant's home. Appellant paid her bond ($110 for a $1,000 bond) and drove her to her parents' house after her release. Ms. Anderson testified that after that day she saw appellant four or five times. On those occasions, appellant gave her money or flowers. She said he gave her $125 to buy clothes on one occasion, $50 to get her nails done on another occasion, and then $30 or $40 on a third occasion. She stated that they did not see each other socially and had not dated.

Appellant testified that Ms. Lancaster and Ms. Lindo stayed at his house, and that he paid Ms. Anderson's bond and gave her cash. He denied attempting to have a romantic involvement with any of the women.

Again, we need not decide that the allegations against appellant were true. The Board certainly could have disbelieved the testimony of the witnesses appellee presented, but even appellant's testimony would support the Board's position.

There was sufficient evidence to support the Board's findings of improper fraternization.

### Charge 8

 Section 16–193(c)(1)(F) of the Prince George's County Personnel Law provides that, for county employees, an infraction occurs: "Where an employee commits an act or a series of acts which have had or may be reasonably demonstrated to have, an appreciable effect on the general public's confidence and/or trust in the operation of the employee's department, agency, or office and/or the government as a whole." Both the Board's Memorandum and the Director's Disciplinary Action Memorandum cited § 16–193(c)(1)(F) and stated that appellant was charged with violating the section, without specifying any acts that constituted the violation.

Appellant argues that appellee has not identified any specific act committed by appellant that violated this provision. At the hearing before the Board, appellant moved to have this charge dismissed for lack of specificity. Counsel for appellee responded:

> The Disciplinary Action Recommendation contains a narrative that summarizes the facts that are the basis for these charges. Each of the charges beyond Number 8 refer to specific acts. Charge Number 8 refers to those acts, and the charges as addressed to the incidents in matters that are dictated in the narrative of the Recommendation and in the list of all of the individual charges as they are there that is more than sufficient specificity to the Defense to know why they're here and what we're here about.

> In addition, I would point out that the Defense has received some 43 documents or exhibits that the Department has and will either be using or has as part of the discovery in this case. In short, they received everything the Department has, with the exception of the dictative report from the investigator. So there are no surprises.

The Board's Chairman, Captain Alfred McMurray, ruled: "[I]t is my opinion that Number 8 is a general term. General

term meaning the total effect of all of the charges, and I'm going to overrule your objection to Number 8...."

Appellee's argument on this issue in its brief is as follows:

The Board, upon hearing all the evidence, and using its own particularized knowledge, found that Appellant's actions would have a negative effect on the public. The testimony of several witnesses indicated that the behavior of Appellant was inappropriate and, in the witnesses' opinion, a conflict of interest. The Board could take administrative notice of the negative impact of newspaper articles concerning problems at other correctional facilities and determine that fraternization with inmates by officers undermines the trust and integrity the Department desires from the public. No showing that this particular case has generated public mistrust was necessary; the potential for such mistrust is sufficient.

The pertinent provision of the county code, quoted above, refers to "acts which *have had* or *may be reasonably demonstrated to have,* an appreciable effect...." (Emphasis added). It seems that appellee has, in effect, conceded that it has not proceeded against appellant under the "have had" portion of the provision, because appellee refers to no evidence demonstrating that appellant's acts "have had" an effect on the public's confidence or trust in the department "and/or the government as a whole."

Therefore, we must determine whether the Board was provided with substantial evidence that appellant has committed acts that "may be reasonably demonstrated to have, an appreciable effect ...." on the public's trust or confidence. The Board heard evidence that appellant gave female inmates a telephone number that rang at his home, that he posted bail for a female inmate, that he arranged to have a female inmate released to his custody, that female inmates came to live at his house after their release from the facility, and that he failed to fully obey an order from a supervisor regarding his interactions with inmates. These actions, even if motivated by good intentions, could reasonably be viewed as a pattern of conduct

inappropriate for a correctional officer, especially a male officer dealing with female inmates. Correctional officers inevitably have substantial authority over the lives of the people incarcerated under their control, and actions that may be seen as demonstrating the potential for an abuse of that authority should be of the greatest concern to the public and to the Department. We hold that the Board was presented with sufficient evidence to support its finding that appellant committed acts that could be reasonably demonstrated to have an appreciable effect on the public's confidence or trust in the Department.

*Charge 9*

Section 16–108(B)(3) of the Prince George's County Personnel Law provides that county employees are required "[t]o carry out in an efficient, effective, and timely manner, the lawful order or directive rendered by an employee's appointing authority or supervisor, and any assignment which is within the scope of the employee's applicable class standard, except as specifically provided otherwise under the provisions of this Subtitle."

At the Board hearing, Major William Johnson, one of appellant's supervisors, testified that in 1994 he gave a direct order, both orally and in writing, telling appellant that he was prohibited "[f]rom practicing or providing religious services to inmates while he was on the clock and prohibited from passing out personal cards relating to religion—to his religious position at that time."

The Board also heard testimony, as noted above, from two female inmates who stated that appellant gave them business cards after the date of Major Johnson's order. Appellant also testified that although he stopped leading bible study classes during his lunch break in response to Major Johnson's order, he continued to pass out his ministerial cards when inmates asked him a question relating to his identity as a minister. The Board therefore heard evidence sufficient to allow it to find that appellant violated Major Johnson's order. The cir-

cuit court did not err in affirming the Board's finding regarding Charge 9.

## II.

Appellant argues that his failure to obey Major Johnson's order was an action protected by his rights under the United States Constitution and under the Maryland Declaration of Rights. In particular, appellant cites the First Amendment to the Constitution, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech...." He also cites Article 36 of the Maryland Declaration of Rights, which provides, in pertinent part, that

no person ought by an law be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under color of religion, he shall disturb the good order, peace or safety of the State or shall infringe the laws of morality, or injure others in their natural, civil or religious rights.

In his argument, appellant makes no distinction between the First Amendment and Article 36, and we will proceed on the basis that, in the context of this case, the two constitutional provisions have the same effect. *See Supermarkets General Corp. v. State,* 286 Md. 611, 625, 409 A.2d 250 (1979), *appeal dismissed,* 449 U.S. 801, 101 S.Ct. 45, 66 L.Ed.2d 5 (1980).

Appellee responds that the United States Supreme Court has "recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not absolute." *Bowen v. Roy,* 476 U.S. 693, 699, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). The right to free exercise of religion includes both the "freedom to believe and the freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 U.S. 296, 303–304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

 The Supreme Court has recognized three types of government property for First Amendment purposes: (1) places which by tradition or by government fiat have been devoted to assembly and debate, such as streets and parks, where "the government may not prohibit all communicative activity"; (2) public property which the state has opened for use by the public as a place for expressive activity, such as university meeting facilities and school board meetings, where "[t]he Constitution forbids a state to enforce certain exclusions . . . even if it was not required to create the forum in the first place"; and (3) "[p]ublic property which is not by tradition or designation a forum for public communication. . . ." *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The correctional facility where appellant worked falls into the third category, i.e., property owned by the government that is not open to the general public and that is subject to restrictive measures for both the employees and inmates. *See Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "The state, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *see U.S. Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).

 Courts reviewing the administration of prisons and jails must give "appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). In a case concerning the disciplining of inmates, this Court stated that

[p]rison is a place where 'good order and discipline are paramount because of the concentration of convicted criminals.' . . . The adoption and execution of prison policies are 'peculiarly within the province and professional expertise of corrections officials' whose judgment should generally be

deferred to by the courts. Because prison security and the safety of its population are in their hands, prison officials 'must have a wide discretion in promulgating rules....' *Robinson v. State,* 116 Md.App. 1, 9, 695 A.2d 198 (1997) (quoting, *inter alia, Bell v. Wolfish,* 441 U.S. 520, 547–548, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *McCloskey v. Maryland,* 337 F.2d 72, 74 (4th Cir.1964)). Acknowledging that the present case concerns a jail or correction facility rather than a prison, and the disciplining of correctional officers rather than of inmates, we believe that the principle expressed in *Robinson* is instructive here: the peculiar demands of penal institutions must be factored into the deference given to their administrators by courts.

In *De Bleecker v. Montgomery County,* 292 Md. 498, 438 A.2d 1348 (1982), the Court of Appeals held that, in a wrongful termination suit by a former teacher at a county detention center, it was a question for the jury whether the teacher was dismissed for communicating to inmates his opinions about a guard who he alleged had beaten an inmate or for reporting to detention center authorities his disagreement with the guard's actions. In *De Bleecker* the trial court had granted the defendants' motions for a directed verdict on the grounds that, even though the teacher might have a constitutionally-protected right of free speech in the written report he made to the authorities, the teacher had no such right in the oral comments he made to inmates, because those comments had the potential to endanger the facility's operation by inciting the inmates. The Court of Appeals in *De Bleecker* assumed, without deciding, that the trial court was correct in concluding that the teacher's oral statements were not constitutionally-protected speech; the Court reversed because it was the province of the jury to decide whether the teacher would have been fired even in the absence of the county's improper retaliation for the written report, which was protected speech. 292 Md. at 510, 438 A.2d 1348.

The Court of Appeals quoted *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), for the principle that "the State has interests as an employer

in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *De Bleecker*, 292 Md. at 508, 438 A.2d 1348. The Court also stated:

> On retrial, the question whether De Bleecker's oral comments [to the inmates] were constitutionally protected will again rise. Manifestly, that determination must be made in view of the competing considerations involved between the interests of citizens in commenting upon matters of public concern and the legitimate governmental interest in order and security essential in the management of a penal facility.... It is, of course, appropriate that the *Pickering* balancing test be struck in the context of the special factual tableau of a prison facility.

292 Md. at 510–511, 438 A.2d 1348 (citations omitted).

Appellant's supervisors had some discretion to place limits upon his First Amendment rights when his methods of exercising those rights had a potentially negative impact upon the operation of the facility. Further, the order given to appellant by Major Johnson related solely to appellant's activities while on duty as a corrections officer. It did not restrict appellant's freedom of religious belief or unreasonably restrict his ability to exercise his religious beliefs, except to the extent that he was prohibited from distributing his cards or conducting religious classes during working hours. Major Johnson testified that appellant would not have been in violation of his order if appellant responded to a question from an inmate about religious matters, or even if appellant conducted religious activities at the facility after his normal working hours. Major Johnson told appellant that he could request permission from the Department to participate in religious services that occurred during appellant's non-duty hours.

Moreover, in the penal environment, the line between the free exercise of religion and its constitutional sibling, the governmental prohibition against religious establishment, can be easily blurred. Resentment based even on perceived favoritism between guards and prisoners based on religion can

breed discontent in a diverse population that includes those with different religious beliefs and those who embrace no religion or, in some cases, oppose all religion. A penal institution is a governmental operation in which the population is by its very nature unable to walk away to avoid unwanted exposure to the most sincere and well intended religious zealousness, especially when the evangelist is a correctional officer. Under such circumstances, the administration and staff must be especially vigilant in avoiding the appearance of impropriety and the favoring of one religion over another.

Although the order placed restrictions on appellant, those restrictions were both minimal and integrally related to the operation of the facility. Granting deference to the management decisions made by the administrators of the facility in recognition of the peculiar and restrictive circumstances of penal confinement, we hold that the order given to appellant was a legal one and that disobedience of that order was not protected by the United States Constitution or the Maryland Declaration of Rights.

## III.

Appellant contends that the penalties the Board recommended for his violations were "excessive, arbitrary, disparate and capricious." He argues that their excessiveness constituted "legal error," and that they should be vacated. Appellant suggests that the penalties were disproportionate to the offense, and that other persons situated similarly were treated differently.

Addressing the last argument first, we believe that appellant's equal protection or selective enforcement argument was not supported by the evidence presented. Appellant presented witnesses who testified that other correctional officers discussed religion with inmates, but none of those officers were said to have conducted religious classes at the facility during their lunch breaks, and none of those officers were reported to have given inmates cards with a telephone number that rings at their home. Other officers testified that, after

following Department rules and reporting the matters to their supervisors, they had assisted relatives who had been incarcerated at the facility and were attempting to be released on bail. None of these other officers testified that they had provided bail for female inmates unrelated to them and then lived with those inmates. There was no testimony about other corrections officers who had fraternized with inmates to a degree equivalent to appellant's actions, or who had failed to obey an order from a supervisor at the facility. Appellant's allegations about other officers do not make the Department's response to his violations any less appropriate.

The Court of Appeals has held that corrections facility administrators have the discretion to remove a correctional officer when the past conduct of the officer evidences the potential for serious future problems in the operation of the facility and that such a dismissal is not arbitrary or capricious. *Maryland State Department of Personnel v. Sealing,* 298 Md. 524, 539, 471 A.2d 693 (1984). In *Sealing,* the Court quoted testimony from supervisors at the corrections facility who stated that the officer's actions had the potential to be "inflammatory" at the institution; the supervisors testified that no adverse action by the inmates had yet occurred. *Id.* at 538, 471 A.2d 693.

Similarly, in *Hawkins v. Department of Public Safety and Correctional Services,* 325 Md. 621, 602 A.2d 712 (1992), the Court of Appeals held that a probationary prison guard's offensive speech while off-duty and away from the prison gave prison authorities sufficient grounds to dismiss the guard. The guard's dismissal was justified not by the political incorrectness of his speech, but by the interest that the correctional facility's administrators had in not employing a person who lost his temper easily and resorted to inflammatory rhetoric. 325 Md. at 638, 602 A.2d 712. "Thus, the warden of the House of Correction need not have waited for an actual eruption precipitated by Hawkins. It is not necessary 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" *Id.* at 639, 602 A.2d 712

(quoting *Connick v. Myers*, 461 U.S. 138, 152, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

Except to the extent we have responded to appellant's constitutional arguments, our decision does not relate to the content of appellant's speech to inmates. We certainly have no reason or need to doubt the sincerity of appellant's beliefs and a corresponding motivation for his activities. Much testimony was received regarding appellant's charitable nature toward inmates and ex-inmates, and his desire to assist those persons in avoiding recidivism. It is quite possible, as contended by appellant and other witnesses, that his religious discussions with inmates had an ameliorative effect on the inmates and on the facility.

Our references to *Sealing* and *Hawkins* should in no way suggest that appellant's speech and conduct was equivalent to the speech and conduct exhibited by the dismissed correctional officers in those cases. These references simply underscore the fact that the administrators of correctional facilities have some discretion in their management decisions, and that we review those decisions not to decide whether we would have made the same decision, but whether they acted in accordance with the law.

As noted above, we grant a great deal of deference to the Department's presumed expertise in the management of correctional facilities. The nature of the Department's work, *i.e.*, housing potentially disruptive, and even violent, persons who do not want to be housed, illustrates the importance of the Department being able to employ persons whom it trusts to follow orders and exercise good judgment. Appellant's failure to obey an order from a supervisor and his ongoing fraternization with inmates are violations that could generate legitimate concern about his ability to perform his duties without disturbing the effective operation of the facility.

The fact that appellant's actions were not shown to have created any disruption in the facility's operations should not prevent the Department from seeking to avoid future difficulties. Regardless of whether appellant's intentions were

admirable, the Department has the authority to dismiss corrections officers whose conduct has led administrators to be concerned that a more significant problem may arise in the future.

Dismissals have been held to be arbitrary and capricious when unsupported by evidence. *Zeitschel v. Board of Education*, 274 Md. 69, 83, 332 A.2d 906 (1975). Appellant's dismissal was supported by evidence and was not arbitrary or capricious.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**